**Angel TUEROS, Petitioner—Appellant,**

v.

**Charles GREINER, Sup't, Green Haven Correctional Facility, Respondent—Appellee.**

**Docket No. 02–2119.**

United States Court of Appeals, Second Circuit.

Argued: May 6, 2003.

Decided: Sept. 12, 2003.

Peter T. Blum, Legal Aid Society, Criminal Appeals Bureau, Brooklyn, NY, for petitioner—appellant.

Donna Aldea, Assistant District Attorney (Richard A. Brown, District Attorney of Queens County; John M. Castellano, Merri Turk Lasky, Assistant District Attorneys, of Counsel, on the brief), Kew Gardens, NY, for respondent—appellee.

Before: WALKER, Chief Judge, CARDAMONE, SOTOMAYOR, Circuit Judges.

SOTOMAYOR, Circuit Judge.

Petitioner-appellant Angel Tueros was convicted in state court of murder and criminal possession of a weapon. Tueros alleges that his attorney in the state-court criminal proceedings believed that she owed a duty of confidentiality to a witness who could have offered exculpatory testimony, but who ultimately invoked his Fifth Amendment privilege not to do so, and that this belief rendered Tueros' attorney conflicted and thus prevented her from exercising sufficient zeal in her attempts to elicit the testimony. On appeal of the district court's denial of his habeas petition under 28 U.S.C. § 2254, Tueros does not argue that his state-court lawyer's belief was correct or that his lawyer actually owed a duty to the defense witness. He argues instead that the resulting subjective belief that she had a conflict by itself gives rise to an "actual conflict" under *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), for which only an adverse effect on Tueros' lawyer's performance need be shown to demonstrate a constitutional violation. He further argues

that any other conclusion is contrary to or an unreasonable application of *Sullivan*. We reach only this final point, affirming the district court and holding that it was not contrary to or an unreasonable application of clearly established Supreme Court precedent for the state court to conclude that Tueros' attorney did not labor under an "actual conflict" as the Supreme Court used the term in *Sullivan*.

## BACKGROUND

In 1995, petitioner-appellant Angel Tueros was convicted of murder and criminal possession of a weapon, both in the second degree, after a jury trial in New York State Supreme Court, Queens County. The State's case relied on three witnesses to the events surrounding the shooting. Yudis Esteves, one of these three witnesses, lived across the street from the site of the shooting. She testified that she was in her driveway and that she saw Tueros commit the murder.

Hermena Perlmutter, Tueros' trial attorney, subpoenaed Juan Esteves ("Esteves"), Yudis Esteves' husband at the time, to testify at Tueros' trial. The evening before Esteves was to appear in court, Esteves called Perlmutter and, with the aid of the translator, stated that Yudis Esteves could not have seen the shooting because she was in the basement when it occurred. At the end of this conversation, Perlmutter asked Esteves if he had ever been convicted or arrested. Esteves replied that he had been arrested in Massachusetts and that he had jumped bail and fled. Upon hearing that Esteves was a fugitive, Perlmutter ended the conversation, stating that she could not speak with him further, that he should come to court in the morning, and that she needed to speak with the judge. Neither party mentioned establishing any form of attorney-client relationship.

The following morning, Perlmutter spoke with the court *ex parte*. She indicated that she had spoken the night before with a subpoenaed witness who possessed information relevant to Tueros' defense, and the following exchange occurred:

PERLMUTTER: [H]e said something ... that, I believe, to have been an attorney-client privilege. Now, if that is an attorney-client privilege, and the way he said it to me, it was to admit to me something which I know would be harmful to him and perhaps criminal.

COURT: It is certainly not attorney-client privilege, because you are not his attorney.

PERLMUTTER: He doesn't have to pay me to be his attorney. If he comes to me and speaks to me as an attorney, if he believes it is so, then I am bound by that confidentiality.

COURT: Well, go ahead

Perlmutter then requested Esteves be assigned an attorney because she believed "it is altogether possible that if he is advised that he may not testify." The court appointed counsel, who advised Esteves not to answer any questions. When Perlmutter examined Esteves during the trial, outside the presence of the jury, Esteves invoked his Fifth Amendment privilege and refused to answer nearly all questions. Perlmutter did not reveal the information that Esteves had previously communicated to her, and she acquiesced in Esteves' claim to his Fifth Amendment privilege.

Tueros raised a conflict of interest claim on direct appeal, but the Appellate Division affirmed Tueros' conviction, holding that "the conflict, if any actually existed, was resolved when the court assigned separate counsel to the defense witness." *People v. Tueros*, 259 A.D.2d 641, 687 N.Y.S.2d 392, 392 (N.Y.App.Div.1999). Tueros sought leave to appeal, which was denied. *People v. Tueros*, 93 N.Y.2d 1028,

697 N.Y.S.2d 587, 719 N.E.2d 948 (1999). While his direct appeal was pending, Tueros filed a motion under N.Y.Crim. Proc. Law § 440.10(1)(h) in a collateral attack on his conviction. This § 440 motion was denied in a memorandum decision, issued without a hearing. Although Tueros presented a Sixth Amendment ineffective assistance of counsel argument, the court "rule[d] that the defendant has not established that Ms. Perlmutter had an attorney-client relationship with the witness Esteves, and therefore, no conflict of interest could arise from that relationship," citing only to New York state law for the definition of an attorney-client relationship. Leave to appeal the denial of the § 440 motion was denied.

Having exhausted his state-court remedies, Tueros filed a 28 U.S.C. § 2254 habeas petition in the United States District Court for the Eastern District of New York (Jack B. Weinstein, *Judge*). Tueros argued, as he did in state court, that he had been denied his Sixth and Fourteenth Amendment right to counsel because Perlmutter had an actual conflict of interest under *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), and because the state court failed to investigate the conflict when the trial judge was first alerted to the potential conflict by Perlmutter.[1] In a hearing before the district court, Perlmutter stated that she believed that she had owed a duty of confidentiality to Esteves, that she had felt obligated to request an attorney for him despite knowing that such an act would likely culminate in Esteves claiming his Fifth Amendment privilege, and that in retrospect she believed that she should have asked to have been relieved from representing Tueros. She testified that she "knew [she] was in an untenable posi-

tion" and that this untenable position was the reason "why [she] asked for an attorney for [Esteves]."

In a brief unpublished decision, the district court dismissed Tueros' habeas petition. Crediting Perlmutter's subjective belief that she had been "prohibited by the attorney client privilege from utilizing this witness in a way that might adversely affect [the witness's] legal position," it nonetheless concluded that the state court on appeal had "ruled, with justification, that defendant's attorney was not the witness's counsel" and that "[t]here was no conflict." The district court granted a certificate of appealability "on all aspects of the issue of whether there was a conflict of interest."

## DISCUSSION

On appeal, Tueros argues that he was deprived of his Sixth and Fourteenth Amendment right to counsel as defined by *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), because the subjective conflict of interest under which Perlmutter labored amounted to an "actual conflict of interest" as defined in *Sullivan*, and this conflict adversely affected her representation of him. He further argues that the state court's implicit decision otherwise was contrary to or an unreasonable application of *Sullivan*. We hold that it is not an unreasonable interpretation of *Sullivan* to conclude that an "actual conflict" does not exist when the only conflict alleged is premised on a purely subjective belief of a duty of confidentiality.

## I. Standard and Scope of Review

■ We review a district court's denial of habeas relief *de novo*, but we review its findings of fact only for clear error. *Del-*

---

1. On appeal, Tueros does not raise the state court's failure to investigate Perlmutter's con-  flict as a basis for habeas relief.

*Valle v. Armstrong,* 306 F.3d 1197, 1200 (2d Cir.2002).

■ Provided a state court has "adjudicated [petitioner's claim] on the merits," 28 U.S.C. § 2254(d)(1), a federal court has only the limited authority to review a state court conviction as established in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214. Because it is clear that the state court's response to Tueros' § 440 motion adjudicated Tueros' claim "on the merits" as we have interpreted the phrase, *see Aparicio v. Artuz,* 269 F.3d 78, 93–94 (2d Cir.2001), AEDPA requires that we query only whether the state court's implicit holding on Tueros' constitutional claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."[2] 28 U.S.C. § 2254(d)(1). A state court opinion is "contrary to" federal law if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). An "unreasonable application" of federal law occurs if a state court either "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case," *id.,* or if it fails to extend a principle of clearly established law "to situations which that principle should have, in reason, governed," *Kennaugh v. Miller,* 289 F.3d 36, 45 (2d Cir.2002).

■ Under either prong, the unreasonably applied Federal law must be "clearly established" at the time that petitioner's state-court conviction becomes final, and only the holdings of Supreme Court cases may comprise Federal law. *Williams,* 529 U.S. at 412, 120 S.Ct. 1495.

## II. The State Court Did Not Unreasonably Apply Supreme Court Law

■ This appeal presents the question whether Tueros' claim of ineffective assistance of counsel is governed by *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which applies to general allegations of ineffectiveness of counsel, or by *Sullivan,* which applies only when an attorney labors under an "actual conflict" of interest. The importance of this choice is evident in the different burden that each standard places on a defendant attempting to demonstrate a constitutional violation. Under *Strickland,* the ineffectiveness of a defendant's counsel amounts to a constitutional violation only if the defendant can show both that counsel's performance was so deficient as to be "outside the wide range of professionally competent assistance," *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052, and that prejudice resulted because "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. 2052. In contrast, *Sullivan* provides that if a defendant's lawyer had an "actual conflict of interest" in which the lawyer "actively represented conflicting interests," the defendant need only demonstrate that the actual conflict "adversely affected his lawyer's performance" in order to prove a

---

**2.** The state court's failure to cite the relevant federal precedents, and thus the implicit nature of the state court's holding, is not relevant to our review. *See Early v. Packer,* 537 U.S. 3, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (per curiam) (noting that federal habe-

as review "does not even require *awareness* of [Supreme Court] cases" on the part of the state courts being reviewed, "so long as neither the reasoning nor the result of the state-court decision contradicts them").

violation of his Sixth Amendment right to effective counsel. *Sullivan,* 446 U.S. at 348, 350, 100 S.Ct. 1708. *Sullivan* thus grants the defendant a "limited[ ] presumption of prejudice." *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052.

Despite the importance of the definition of an "actual conflict," which if demonstrated permits a defendant to bring his case within the ambit of *Sullivan,* our role as reviewer of the district court's denial of Tueros' § 2254 habeas petition is limited and does not entail stating our opinion as to the proper division between the cases in which *Strickland* and *Sullivan* should apply. Under our congressionally circumscribed authority established in § 2254(d)(1), we address the issue only tangentially and hold that it was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent to conclude that Tueros' counsel did not have an "actual conflict" of interest as defined in *Sullivan.*

Furthermore, although we hold that the state court was not required to apply *Sullivan,* we do not proceed to the *Strickland* analysis in this case. Such an analysis will often be a logical subsequent step in similar cases, but petitioner failed to present a *Strickland* argument to this Court in his brief, and expressly disclaimed the applicability of *Strickland* during oral argument, so we consider petitioner's *Strickland* argument to have been abandoned.[3] *See* Fed. R.App. P. 28(a)(9); *LoSacco v. City of Middletown,* 71 F.3d 88, 92–93 (2d Cir. 1995) (holding that issue is abandoned where not raised in appellate brief).

## A. The alleged "actual conflict" in *Sullivan*

In *Sullivan,* Sullivan and his two alleged accomplices were tried for murder in Pennsylvania state court in three separate trials, and two privately retained lawyers, DiBona and Peruto, were involved in all three trials. *Sullivan,* 446 U.S. at 337, 100 S.Ct. 1708. Neither Sullivan nor his lawyers objected to multiple representation at trial or on direct appeal. *Id.* at 337–38, 100 S.Ct. 1708. Sullivan's trial occurred first, and the defense rested without having Sullivan testify. *Id.* at 338, 100 S.Ct. 1708. Sullivan was convicted, although the two other defendants were subsequently acquitted. *Id.* During Sullivan's petition in state court for collateral review, Peruto testified that the decision not to have Sullivan testify at his own trial was affected by Peruto's conflict with the interests of the other defendants: Peruto was concerned that having Sullivan testify "would only be exposing [defense] witnesses for the other two trials that were coming up." *Id.* at 338–39, 100 S.Ct. 1708. Other non-conflicted explanations for Sullivan's silence were, however, also given. *Id.* The Pennsylvania Supreme Court affirmed both Sullivan's conviction and the denial of his petition for collateral relief, finding that no multiple representation had occurred because DiBona had represented Sullivan, and Peruto had represented the other two defendants in their subsequent trials. *Id.* at 339, 100 S.Ct. 1708.

Sullivan filed a habeas petition in federal court. *Id.* The district court denied the petition, but the Third Circuit reversed the district court and granted the petition. *Id.* at 339–40, 100 S.Ct. 1708. The reversal was based on two conclusions: The Third Circuit found that, contrary to the finding of the Pennsylvania Supreme Court, dual representation did occur because both lawyers represented all three defendants, *Sullivan v. Cuyler,* 593 F.2d 512, 517–19 (3d

---

**3.** Furthermore, the district court concluded that Perlmutter "acted well within the bounds of propriety in bringing the matter to the court's attention," a finding that would likely undermine Tueros' *Strickland* claim.

Cir.1979), and it held that, as a matter of law, dual representation amounted to constitutionally defective counsel requiring reversal if there was "some showing of a possible conflict of interest or prejudice, however remote," *id.* at 519 (quoting *Walker v. United States,* 422 F.2d 374, 375 (3d Cir.1970) (per curiam)).

The Supreme Court vacated the Third Circuit's judgment. *Sullivan,* 446 U.S. at 350, 100 S.Ct. 1708. The Court "agree[d] with the Court of Appeals that these facts establish the existence of multiple representation," *id.* at 342, 100 S.Ct. 1708, but held that multiple representation violates a defendant's Sixth Amendment rights only if the defendant can "establish that an actual conflict of interest adversely affected his lawyer's performance," *id.* at 350, 100 S.Ct. 1708. Because the Third Circuit had not considered whether the conflict under which Sullivan's attorney labored had adversely affected his performance, the Court remanded. *Id.*

### B. Multiple representation

Respondent argues that the state court's decision not to extend the scope of *Sullivan*'s "actual conflict" analysis to encompass Tueros' claim was not contrary to, or an unreasonable application of, *Sullivan* because the "adverse effect" standard in *Sullivan* is limited to cases of multiple representation. *Cf. Smith v. Hofbauer,* 312 F.3d 809, 817–18 (6th Cir.2002) (refusing, on habeas review, to apply *Sullivan* to an alleged conflict due to the prosecution of defendant's attorney in the same county in which defendant was convicted); *Beets v. Scott,* 65 F.3d 1258, 1265–66 (5th Cir. 1995) (en banc) (applying, on habeas review, *Strickland* rather than *Sullivan* to two alleged breaches of ethical duties by defense counsel, taking a media rights contract as a fee and failing to withdraw to testify as a material witness).

Insofar as respondent suggests that we are *bound* by language in *Mickens v. Taylor,* 535 U.S. 162, 122 S.Ct. 1237, 1245–46, 152 L.Ed.2d 291 (2002), to sustain this argument, we are unpersuaded. In *Mickens,* the Court addressed a defense counsel's conflict arising from successive representation and held that the *Sullivan* "adverse effect" standard controlled even if the trial court neglected a duty to inquire into the potential conflict of which it knew or should have known. *Id.* at 1243–45. As a postscript to its holding, however, the Court noted that certiorari had been granted on the presumption that *Sullivan* applied to successive representation cases, and that "[w]hether *Sullivan* should be extended to such cases remains, as far as the jurisprudence of this Court is concerned, an open question." *Id.* at 1246. In the course of this discussion, the Court also noted that *Sullivan* "stressed the high probability of prejudice arising from multiple concurrent representation" and "that the language of *Sullivan* itself does not clearly establish, or indeed even support, ... expansive application" of the "adverse effect" standard beyond cases in which attorneys actively represent conflicting interests. *Id.* at 1245. This language in *Mickens,* however, is not dispositive of our analysis here. Not only was *Mickens* decided several years after the state court conviction became final, but the discussion of the scope of *Sullivan* is dicta. *See id.* (noting that the question presented to the Court presumed that *Sullivan* applied and that questions related to *Sullivan*'s scope were outside the issues considered). For "clearly established Federal law" under § 2254(d), we must look to *Sullivan,* not to the *Mickens* postscript. If *Sullivan* by its own terms were to apply to cases other than multiple representation cases, the Supreme Court could not retroactively "unestablish" this clear law in dicta, because the command of § 2254(d) indicates that we are only able to consider the *holdings*

of Supreme Court cases decided at the time of the state court conviction.

Insofar as respondent relies on the language of *Sullivan* itself, the argument that *Sullivan* applies only in cases of multiple representation also misses the point: If we were to accept Tueros' theory, as discussed below, that a subjective conflict of interest can constitute an "actual conflict," then Perlmutter effectively engaged in multiple representation because she felt she had a duty both to Esteves as a witness and to Tueros as the defendant. Tueros alleges a conflict between duties owed to more than one person, not a conflict between a client's interests and the lawyer's self-interest, the most common type of case in which courts have held that *Strickland* rather than *Sullivan* should apply. *Cf. Beets,* 65 F.3d at 1268–72 (considering the rationale for applying *Strickland* rather than *Sullivan* to conflicts between an attorney's personal interest and his client's interest). Although *Sullivan* dealt with a lawyer who owed duties to multiple defendants, it may well be unreasonable not to extend *Sullivan*'s definition of an "actual conflict" to a lawyer whose conflict was defined by representing the divergent interests of a defendant and an important subpoenaed witness.[4]

### C. Can a purely subjective conflict be an "actual conflict"?

Tueros argues that his counsel's subjective belief that she owed a duty of confidentiality to Esteves, combined with the duty she actually owed to Tueros, creates the type of "actual conflict" to which the "adverse effect" standard articulated in *Sullivan* applies, and that concluding that Tueros' counsel did not labor under an "actual conflict" is either contrary to or an unreasonable application of *Sullivan.*

■ We initially note that we credit Tueros' allegation that his counsel believed that she owed a duty of loyalty to Esteves not to divulge confidential information. Although a person's subjective beliefs are by their nature difficult to verify, the subjective belief of Tueros' counsel is a question of fact, and the district court found that Tueros' counsel believed that she had conflicting duties: "Counsel believed that she was prohibited by the attorney client privilege from utilizing this witness in a way that might adversely affect [the witness's] legal position." We hold that this finding is not clearly erroneous.

■ However, while we accept that Tueros' counsel believed she had a conflict of interest and that, as Tueros states in his brief, she "decided to treat [Esteves'] Massachusetts problems as confidential information," we do not determine whether Tueros' counsel owed an actual legal duty of any kind to Esteves. Tueros does not argue on appeal that the objective events that occurred created a relationship entailing any legal duties owed by Perlmutter to Esteves.[5] He argues only that Perlmutter

---

**4.** In *Wood v. Georgia,* 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981), another source of clearly established federal law, the Supreme Court remanded for a determination of whether a lawyer paid by an employer, but representing an employee, suffered from an "actual conflict" under *Sullivan. See id.* at 273–74. The opinion does not discuss whether the lawyer also formally represented the employer, so *Wood* suggests that relationships other than representation of defendant by counsel may create actual conflicts. *Cf. Beets,* 65 F.3d at 1267 (describing the rela-

tionship between the employer and the counsel in *Wood* as the "functional equivalent" of representation).

**5.** Tueros does argue that the district court incorrectly stated that the state trial court "ruled" that Perlmutter was not Esteves' attorney, but he proceeds to state that "any supposed ruling ... [is] irrelevant." Because we proceed on the basis on which the case was argued to us—namely, that the conflict was purely subjective—we need not address

"believ[ed] that she had a duty to act as [Esteves'] attorney as well as petitioner's" and that the case presents the question "whether the conflict in Perlmutter's actual, subjective loyalties affected her performance at trial."[6]

This characterization of Perlmutter's conflict as purely subjective, however, does not minimize the potentially detrimental impact of the conflict on the quality of Tueros' representation. Although lacking an objective counterpart, a heartfelt belief on the part of counsel that she owes a duty of confidentiality to a witness can wreak the same havoc on an effective defense whether she is correct or mistaken in that belief.

To determine whether the state court's implicit conclusion that a purely subjective conflict of interest cannot amount to an "actual conflict" under *Sullivan* is contrary to, or an unreasonable application of, clearly established federal law, we turn to the analysis in *Sullivan* itself. At one point in the opinion, the Court's language can be read to define whether a conflict exists by the effect of the conflict on the defendant's representation. *See Sullivan*, 446 U.S. at 349–50, 100 S.Ct. 1708 ("[A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief."). If it is the effect that defines an "actual conflict," then a purely subjective conflict should fall within the ambit of *Sullivan* because, as discussed above, its impact on the defendant's representation can be similar to the effect of conflicting actual duties. Other language in *Sullivan* arguably defines an "actual conflict" by the conduct of the attorney during representation, *see id.* at 350, 100

S.Ct. 1708 ("[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance."), which also suggests that a subjective conflict is within the scope of *Sullivan* because an attorney who mistakenly believes that she has a conflict of interest will likely act in the same fashion as one who correctly holds that belief.

Despite this ambiguous language, however, the Court's holding in *Sullivan* is not so broad. The Court indicated that before it could discuss whether an actual conflict existed, it had to review the Third Circuit's rejection of the Pennsylvania Supreme Court's conclusion that no multiple representation occurred. *See Sullivan*, 446 U.S. at 341–42, 100 S.Ct. 1708 (noting that "[a]t the outset, we must consider" the Third Circuit's conclusion on multiple representation). Although multiple representation does not by itself give rise to a conflict of interest, *see Holloway v. Arkansas*, 435 U.S. 475, 482, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), the *Sullivan* opinion is structured such that it is not unreasonable to conclude that multiple representation—or a similar relationship—is a required precondition of an actual conflict. The fatal blow to Tueros' argument, however, flows not from the Court's search for some form of multiple representation itself, *see ante* Section II.B, but from the contents of the Court's analysis used to discern whether multiple representation occurred. The Court engaged in a fact-based examination of the trial court proceedings to conclude that the conduct of the attorneys gave rise to the duties inherent in the representation of a criminal defendant. *Sullivan*, 446 U.S. at 342, 100 S.Ct. 1708.

the import of the trial court's statement or ruling.

**6.** We do note in passing, however, that a witness's unilateral decision to volunteer in-

formation to defense counsel is unlikely to create any legal duty of confidentiality on the part of defense counsel.

In affirming the Third Circuit's conclusion that multiple representation had occurred, the Court relied on the opinion below and summarized it as follows:

> The Court of Appeals carefully recited the facts from which it concluded that DiBona and Peruto represented both Sullivan and his codefendants. The court noted that both lawyers prepared the defense in consultation with all three defendants, that both advised Sullivan on whether he should rest his defense, and that both played important roles at all three trials. In fact, the transcript of Sullivan's trial shows that Peruto rather than DiBona rested the defense. We agree with the Court of Appeals that these facts establish the existence of multiple representation.

*Id.* (internal citations omitted). The Court did not focus on whether the attorneys believed that they owed conflicting duties; rather, it queried whether their conduct was the type of conduct that constituted representation of a criminal defendant, a relationship that entails objective legal duties.

The Third Circuit, in the discussion on which the Supreme Court relied, also had examined whether the facts created the legal duties inherent in representation. For example, it described the significance of Peruto's role in Sullivan's defense as follows:

> We believe that an attorney who enters an appearance on behalf of a criminal defendant, consults with him confidentially for the purpose of preparing a defense, investigates his case, aids in the pretrial preparation of his defense, appears at his trial, participates in the

selection of the jury that is to decide his fate, argues motions and objections, confers with co-counsel on trial strategy, offers the defendant legal advice, including advice on whether he should testify or present evidence in his defense, and argues the issue of penalty, a matter of life and death, to the jury on the defendant's behalf *must be said to represent that defendant and owe to him all the duties an attorney owes to a client in a criminal case.* We find that Peruto represented Sullivan as well as [his codefendants].

*Sullivan,* 593 F.2d at 519 (emphasis added).

Petitioner therefore mischaracterizes *Sullivan* insofar as he argues that the Court "reasoned . . . that multiple representation had occurred because both lawyers *believed* that they were representing all three defendants."[7] In its discussion of multiple representation, the Court asked whether the conduct of the attorneys constituted representation and, thus, whether duties inherent in representation actually existed; the Court proceeded to ask whether a conflict existed only after determining that more than one such relationship existed. This analysis is reasonably interpreted as objective: Did the events that occurred create actual relationships with legal significance between counsel and more than one person? In summary, the state court's decision not to apply *Sullivan* to a purely subjective conflict of interest was neither contrary to, nor an unreasonable application of, *Sullivan*—the conflict alleged here does not present facts that are "materially indistinguishable" from those in *Sullivan,*

---

**7.** Although the Third Circuit also considered the attorneys' beliefs that they were co-counsel representing all three defendants, *see Sullivan,* 593 F.2d at 519 (summarizing testimony by noting that DiBona and Peruto "seem to have viewed themselves as a defense 'team' acting on behalf of all three of the accused"), this discussion of the attorneys' subjective beliefs may be reasonably interpreted as one element of the inquiry into the existence of an objective duty.

*Williams,* 529 U.S. at 413, 120 S.Ct. 1495, nor is it the case that *Sullivan* "should have, in reason, governed," *Kennaugh,* 289 F.3d at 45.

Limiting the scope of an "actual conflict" to conflicts arising from actual duties is also reasonable in light of the policies animating the various standards used to vindicate a defendant's Sixth Amendment right to counsel in different contexts. Although defense counsel's actual and perceived duties owed to parties other than the defendant may cause equal injury to the defendant's case, the question presented is whether defendant's burden should be the same when trying to prove that such injury amounts to a constitutional violation. Only conflicts arising from actual duties are structural flaws in our adversarial system of justice that guarantees each defendant a lawyer functioning in an institutional role that permits zealous advocacy. A purely subjective conflict is, in contrast, an attorney's individual shortcoming, flowing from an incorrect assessment of the situation and devoid of any actual obligation. Purely subjective conflicts are, in fact, no more than a polite

way of saying personal mistakes, a traditional type of ineffectiveness of counsel to which *Strickland* rather than *Sullivan* is routinely applied. Reserving *Sullivan*'s limited presumption of prejudice to remedy the structural flaw that occurs when a lawyer is placed in the untenable situation of being required to serve two masters is a reasonable line to draw.[8] Furthermore, where a subjective conflict causes injury to the defendant, *Strickland* may provide a remedy.[9]

We also note that the purely subjective standard for measuring conflicts advocated by Tueros would, in certain situations, create more injustice than it would remedy. If an "actual conflict" is determined only by the attorney's belief, then an attorney who is blinded to his or her own conflict could not violate his client's constitutional rights. Tueros instead might have argued that either a conflict of objective duties or a subjective-yet-verifiable belief in conflicting duties could give rise to an "actual conflict," but the result of our analysis would be the same: It is neither contrary to nor an unreasonable application of *Sullivan* to reserve the "adverse effect" stan-

---

8. The application of *Strickland* rather than *Sullivan* to purely subjective conflicts is also logical in light of one of the justifications that the Supreme Court has given for the limited presumption of prejudice available under *Sullivan.* "Given ... the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest" under *Sullivan. Strickland,* 466 U.S. at 692, 104 S.Ct. 2052. As opposed to a conflict based on an objective duty, a purely subjective conflict will almost always slip under the radar of the trial court.

9. The clean division between subjective and actual duties made here might give rise to a hypothetical difficulty in the context of a defense counsel's mistaken-yet-reasonable belief that a separate duty conflicts with the duty actually owed to the defendant. In most

cases, counsel's belief will be reasonable only when there is a conflict between actual obligations. But, informational asymmetry between counsel and the person to whom the duty is perhaps owed, or some other set of unusual facts, might also create a mistaken-yet-reasonable belief in conflicting duties. Analyzing such conflicts under *Strickland,* however, might prove awkward because the more reasonable the attorney's belief is (and the closer to an "actual conflict" the subjective conflict becomes), the less likely the attorney's behavior will be perceived to deviate from the norms of the profession, and, therefore, the less likely the *Strickland* standard will afford relief. Although this concern might sway our reasoning in a direct appeal of whether a purely subjective, yet reasonable, conflict should be analyzed under *Sullivan,* it does not in an appeal, such as this one, that is constrained by the AEDPA standard.

dard, and its limited presumption of prejudice, for cases involving an actual conflict of objective duties, such as the duties that arise from the actual representation of a party involved in a criminal proceeding.

Tueros also argues that the *Sullivan* analysis must focus on counsel's subjective beliefs because the only viable alternative is an objective analysis under the state law of attorney-client privilege, but neither *Sullivan* nor the cases applying *Sullivan* discuss state law. In fact, because federal habeas courts cannot review questions of state law, *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), the state law of attorney-client privilege cannot have been determinative of the multiple representation question in *Sullivan*. *Cf. Sullivan*, 446 U.S. at 342, 100 S.Ct. 1708 ("[T]he holding that the lawyers ... did not engage in multiple representation is a mixed determination of law and fact ... [that] is open to review on collateral attack in a federal court."). This argument, moreover, creates a false dichotomy between a federal-law, subjective analysis and a state-law, objective analysis: It is entirely reasonable to hold that whether an objective relationship between defense counsel and any person carries legal significance under *Sullivan*—namely whether such a relationship can give rise to a duty capable of creating an "actual conflict"—is determined by Sixth Amendment jurisprudence.

Because we hold that it is not an unreasonable application of *Sullivan* to conclude that Tueros' counsel did not have an "actual conflict," we do not reach the issue whether the conflict "adversely affected [counsel's] performance," *Sullivan*, 446 U.S. at 348, 100 S.Ct. 1708, by allegedly restricting Perlmutter's use of tactics that might have garnered Esteves' exculpatory testimony.

## CONCLUSION

We hold that it was neither contrary to, nor an unreasonable application of, *Sullivan* to conclude that Tueros' counsel's purely subjective belief that she owed a duty to a defense witness did not amount to an "actual conflict" as *Sullivan* defines the term, and we affirm the district court's denial of Tueros' habeas petition under § 2254.