**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-1452
_____

WALTER A. TORMASI,
                                        Appellant

v.

ATTORNEY GENERAL NEW JERSEY; BRUCE DAVIS
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 3:18-cv-16340)
District Judge:  Honorable Georgette Castner
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
February 26, 2025
Before:  BIBAS, FREEMAN, and NYGAARD, <u>Circuit Judges</u>

(Opinion filed:  March 4, 2025)
_____

OPINION[*]
_____

_____
[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

PER CURIAM

Walter Tormasi (Tormasi), a New Jersey state prisoner proceeding pro se, appeals from the District Court's order denying his habeas petition under 28 U.S.C. § 2254. For the following reasons, we will affirm.

In 1998, Tormasi was convicted of first-degree murder for the shooting death of his mother, Frances Tormasi. Tormasi, who was 16 years old at the time of the offense, was tried as an adult and sentenced to life imprisonment with a 30-year period of parole ineligibility pursuant to N.J.S.A. 2C:11-3(b)(1).

The District Court quoted at length the New Jersey Superior Court's opinion setting forth the significant evidence against Tormasi at trial. Briefly, at the time of her murder, Frances and Tormasi's father, Attila Tormasi, Sr. ("Attila Sr."), were separated and in the midst of a bitter divorce. Frances was living in a boarding house that she owned with Attila Sr.; her boyfriend also resided there. Attila Sr. lived at home with Tormasi and his siblings. On the night of the shooting, Attila Sr. left the home around 6:00 p.m. About an hour later, Attila Jr.'s soccer coach, Lajos Ivan, and his wife, Maria, arrived in the Tormasi driveway. Ivan saw someone near the garage and approached him, thinking it was Attila Jr. Ivan later identified the person as Tormasi, and testified that Tormasi was wearing gloves when he shook his hand, and that Tormasi told him that he was waiting for his mother to pick him up. When she arrived, Tormasi stated "my mother's here." See ECF No. 19 at 2. Ivan and Maria pulled out of the driveway. Maria saw Tormasi approaching his mother's car "smiling." Id. As they drove away, the Ivans

2

heard a "pop-pop-pop" that sounded like a gun. Id. Frances was shot ten times as she was in her car in the driveway.

When the police arrived at the scene, Tormasi came out of the side of the garage with his hands up. He told police that he was waiting for his mother to take him to the mall, but when she arrived, a masked gunman dressed in black and wearing a ski mask came out of the bushes and shot her. He stated that he chased the gunman for a mile-and-a-half but lost him in a wooded area. The police observed that Tormasi was not perspiring or showing any signs of running that far. He claimed that he had "his own suspicions" about the gunman's identity, but would not provide a name to the police. Id. at 3.

The investigation recovered 9-millimeter bullets from the crime scene and from a wall in the Tormasi home. At trial, a firearms expert testified that those bullets were fired from the same gun as the bullets recovered from a shooting, months earlier, at the Tormasi's boarding house. The victim, retired police officer Neil Dougherty, was shot through the window of his room at the boarding house. Tormasi's fingerprints were found on a chair below the window.

Various witnesses testified that Tormasi made incriminating statements about both shootings. Tormasi's ex-girlfriend, Andrea Hamilton, testified that, prior to Frances' murder, Tormasi told her that his father wanted him to shoot Frances' boyfriend. He told Hamilton that he went to the boarding house, "stood on a chair," and shot into the window; but he stated that he "shot a cop instead" because his father told him the wrong

3

window." Id. at 5. Tormasi also told her that his father wanted to pay him to shoot his mother, but he "was not going to get involved in that." Id. Tormasi showed Hamilton a hole in the basement wall into which he claimed to have fired a gun. Bradford Krill, Tormasi's long-time schoolmate, testified that, on the day of the shooting, Tormasi told him that he hated his mother, and that she was coming to pick him up that evening and he was going to kill her. Tormasi also told Krill that he had obtained a 9-millimeter handgun. Joseph Alessandra, who was with Krill at the time, testified that Tormasi asked him how he "would shoot someone that was in a car." Id. at 6. Another long-time schoolmate of Tormasi, whose father was the chief of police, testified that Tormasi asked him about how to clean gunpower residue off of hands after firing a gun, and about whether it could be traced if cleaned off. Several other witnesses testified that Tormasi either told them he had a gun or showed them a handgun. Finally, another schoolmate, who was in the juvenile detention center with Tormasi, testified that Tormasi admitted that he had shot his mother when she pulled up in her Jeep, and that he had "shot the cop" at the boarding house. Id. at 8.

Tormasi's conviction was upheld on direct appeal, and he unsuccessfully sought post-conviction relief (PCR) in the state courts. In his 2002 petition, Tormasi claimed, inter alia, that his attorney was ineffective for failing to present evidence that Tormasi's father, Attila Sr., hired an unknown third party to kill his wife, Frances.[1] He made the

---

[1] In 2002, Tormasi's evidence of his father's guilt included recorded telephone conversations and surveillance equipment allegedly demonstrating that his father was

4

same claim in a 2006 petition, presenting much the same evidence, and identifying the third party as Michael A. Falcon, a private investigator whom his father had hired to investigate Frances's activities as part of the divorce.

Tormasi's latest PCR petition, initially filed in 2011, was based on "newly discovered evidence" in the form of a purported "affidavit" by Attila Sr., then deceased, asserting that he had hired Falcon to kill Frances, and that his son was innocent of the offense. Attila Sr. also stated in the document that he paid $10,000 cash to Tormasi's trial counsel, Lewis White, in exchange for not implicating Attila Sr. in the crime as part of the defense.[2] The 38-page document ended mid-sentence, and was missing a signatory page. Tormasi asserted an innocence claim, and an ineffective-assistance-of-counsel claim, alleging that White had a conflict-of-interest because of the undisclosed fee arrangement with Attila Sr.

The PCR court held a hearing at which Tormasi's sister, Sophia, and brother Attila Jr. both testified that they had seen the document years earlier, including the signatory page which they stated was signed by their father and notarized. They also testified that they separately confronted their father, who admitted that the affidavit's contents were

aware of France's "activities," including that she was scheduled to arrive at Tormasi's home on the night of the murder, where she was killed. Tormasi also provided evidence of his parents' marital problems, including incidents of domestic violence by Attila Sr. against Frances, and adultery and financial misdeeds by Frances, which he claimed demonstrated his father's motive to hire a third-party to kill her.

[2] At the time of Tormasi's trial, White was acting as a pool attorney for the New Jersey Public Defender's Office (PDO).

true. The state presented Falcon, who denied the murder-for-hire plot. The PCR court denied all relief after determining that the affidavit was not admissible because it was missing Attila Sr.'s signature and the jurat of a notary public. The Superior Court, Appellate Division, reversed and remanded for the PCR court to evaluate whether the document could be authenticated by extrinsic evidence, including the witness testimony. See State v. Tormasi, 128 A.3d 182, 188-89 (N.J. Super. Ct. App. Div. 2015).

While that appeal was pending, Tormasi uncovered additional evidence of the $10,000 payment, which the PCR court considered at a hearing on remand.[3] The PCR court ultimately denied both claims. It found that the document, although admissible, was "not believable" and lacked "sufficient weight" to "probably alter the outcome of the [original] verdict." ECF No. 11-76 at 180 (alteration in original). Although the PCR court accepted "the fact" that Tormasi's father paid White $10,000 cash, it determined that Tormasi had not demonstrated that White rendered ineffective assistance. Id. at 179.

---

[3] The additional evidence included a memorandum prepared by an investigator for the New Jersey Office of the Public Defender (PDO), who looked into allegations that White wrongfully accepted the payments while he was being paid by the State. The Somerset County PDO had obtained a judgment lien on Attila Sr.'s home based on White's representation of Tormasi. The PDO investigator examined a letter sent by Attila Sr. in 1999 to the PDO, complaining about the lien and explaining that he paid White $10,000 for his legal services. Attila Sr. attached two checks made out to cash, both indicating in the memo that they were for "Legal (White)." ECF No. 14-10 at 182-85. Attila Sr. reportedly told the PDO investigator that he paid White to "relieve [his] financial stress" and "motivate [him] to work harder on [Tormasi's] case." Id. at 22.

6

The Superior Court affirmed. See State v. Tormasi, No. A-4261-16T4, 2018 WL 5623953, at *1 (N.J. Super. Ct., App. Div. Oct. 31, 2018).

In 2018, Tormasi filed a habeas petition in the District Court, presenting only the conflict-of-interest ineffectiveness claim.[4] The District Court denied the petition on the merits, but granted a certificate of appealability on the claim. See ECF Nos. 19 & 20. This appeal followed.[5]

We have jurisdiction pursuant to 28 U.S.C. §§ 2253(c)(1)(A) and 1291. We exercise plenary review over a district court's dismissal of a habeas petition where the court did not hold an evidentiary hearing. See Dennis v. Sec'y Pa. Dep't of Corr., 834 F.3d 263, 280 (3d Cir. 2016) (en banc). Like the District Court, our review of the state court's decision is deferential.[6] See Staruh v. Superintendent Cambridge Springs SCI, 827 F.3d 251, 258 (3d Cir. 2016). Specifically, habeas relief is unavailable unless the state court's adjudication of the conflict-of-interest claim "resulted in a decision that was

---

[4] The District Court stayed the matter, and held it in abeyance pending state court exhaustion of the claim. See ECF No. 3; see also Rhines v. Weber, 544 U.S. 269, 277-78 (2005). The habeas proceeding was reopened in May 2019.

[5] We generally appoint counsel where, as here, a certificate of appealability is granted and the petitioner is proceeding in forma pauperis. See 3d Cir. I.O.P. 10.3.2. However, we granted Tormasi's motion for leave to proceed pro se.

[6] We review the state court's last reasoned decision. See Abdul-Salaam v. Sec'y of Pa. Dep't of Corr., 895 F.3d 254, 265 (3d Cir. 2018). Here, that is the PCR court's decision because the Superior Court affirmed "substantially for the reasons set forth" by the PCR court. Tormasi, 2018 WL 5623953, at *2; see also Bond v. Beard, 539 F.3d 256, 289-90 (3d Cir. 2008).

contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d). "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

Tormasi claimed in his habeas petition, as he had in the state courts, that White was ineffective because he labored under an actual conflict of interest stemming from the "third-party fee transaction" – the cash payment from Attila Sr. ECF No. 1 at 5. Tormasi argued that White was conflicted by the payment because Attila Sr. could have been implicated in the crime, and that that the conflict adversely affected White's performance by, inter alia, influencing his decision not to present evidence at trial implicating Attila Sr.

Generally, to succeed on an ineffective-assistance-of-counsel claim, a petitioner must demonstrate both that (1) counsel's performance was deficient, i.e., unreasonable under prevailing professional standards, and that (2) he suffered prejudice, i.e., a reasonable probability that but for counsel's ineffectiveness, the outcome of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 687 (1984). However, the Supreme Court has recognized that prejudice may be presumed if the petitioner demonstrates that his counsel "actively represented conflicting interests." Cuyler v. Sullivan, 446 U.S. 335, 348, 350 (1980) (citation omitted); see also Wood v.

8

Georgia, 450 U.S. 261, 271 (1981) (recognizing that the right to counsel under the Sixth Amendment entails "a correlative right to representation that is free from conflicts of interest").

White's financial conflict-of-interest claim is grounded in the Supreme Court's decisions in Sullivan and Wood. In Sullivan, two retained defense lawyers represented three defendants accused of murder but tried separately. See 446 U.S. at 337. Sullivan was convicted, and the other two defendants were later found not guilty. The Court of Appeals granted habeas relief because Sullivan had shown that the multiple representation in his case involved a possible conflict of interest. The Supreme Court vacated the judgment, holding that the mere possibility of a conflict "is insufficient to impugn a criminal conviction." Id. at 350. It recognized that "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice" to establish an ineffective assistance of counsel claim. Id. at 349. It remanded for the Court of Appeals to evaluate counsel's performance under this legal standard. Id. at 350.

In Wood, the indigent defendants, who had been convicted of distributing obscene materials in the course of their employment for the owner of an adult bookstore and theater, had their probation revoked for failure to pay their fines. Their employer had failed to pay the fines, despite assurances it would do so as it had for other employees. The defendants challenged the fines as a violation of the Equal Protection Clause, arguing that their revocations discriminated against them on the basis of wealth. The Supreme

9

Court sua sponte noted a possible due process violation because counsel for the defendants had "acted as the agent of the employer and ha[d] been paid by the employer." Wood, 450 U.S. at 267. Because it appeared that the employer's interest in contesting the fines on Equal Protection grounds conflicted with the employees' interest in obtaining leniency regarding the fines, the Court remanded for the trial court to determine whether an actual conflict of interest existed that affected counsel's performance. See id. at 169-70; see also Mickens v. Taylor, 535 U.S. 162, 171 (2002) (explaining that an actual conflict is "a conflict *that adversely affected counsel's performance* – as opposed to a mere theoretical division of loyalties").

The PCR court first determined that there was no conflict of interest where a parent pays his child's attorney. It then rejected Tormasi's argument that Sullivan governed his claim, concluding that the mere possibility that his father "might have paid White not to focus on Attilia (sic) Sr.'s motives to kill Francis (sic) Tormasi, his wife," was insufficient to show an actual conflict of interest. ECF No. 11-76 at 179. Finally, the PCR court determined that Attila Sr.'s affidavit was unbelievable, and that Tormasi could not demonstrate that, "but for his attorney's efficient (sic) conduct, the outcome of the trial would have been different." Id. at 179-80.

In his habeas pleadings, Tormasi acknowledged that not all situations involving a counsel's divided loyalties may come within Sullivan's ambit, but he argued that Sullivan "governs conflict-creating fee transactions," citing Wood. ECF No. 12 at 19. He further argued that the state courts erred by failing to recognize that the fee transaction between

White and Attila Sr. created an impermissible conflict of interest under Wood, and by requiring him to demonstrate Strickland prejudice, rather than presuming it under Sullivan. See id. at 15-41.

The District Court rejected the claim. It concluded that the PCR court's decision was neither contrary to, nor an unreasonable application of, federal law as announced by the Supreme Court. See 28 U.S.C. § 2254(d). Specifically, it determined that Sullivan and Wood "do not constitute clearly established federal law for the proposition that [a third-party fee] arrangement *automatically* creates an impermissible conflict of interest."[7] ECF No. 19 at 27-28. It then found that the PCR court's determination that Tormasi was not prejudiced by his counsel's performance was not based on an unreasonable determination of the facts. Id. at 29-33.

The District Court relied heavily on Mickens, in which the Supreme Court observed in dicta that it had not extended Sullivan's presumption of prejudice outside the context of multiple concurrent representation. 535 U.S. at 175-76 (noting that whether Sullivan extends to other situations, including cases of successive representation, "is an open question"). It noted that, post-Mickens, courts have held that the Sullivan exception

---

[7] The District Court appears to have assumed that Attila Sr. made the payment to White. See ECF No. 19 at 29 (referring to the "purported fee payments"). And Appellees concede the fact in their brief here. See Appellees' Br. at 45-46 ("It is clear that Attila paid Mr. White $10,000 dollars – he himself admits as much."). Therefore, we need not consider Tormasi's argument that the District Court should have held an evidentiary hearing on the issue.

11

is clearly established federal law for purposes of AEDPA only as it relates to conflict-of-interest claims based on multiple concurrent representation.[8]  See Schwab v. Crosby, 451 F.3d 1308, 1327 (11th Cir. 2006) ("[A] decision that Sullivan's limited presumption of prejudice does not apply [outside the context of multiple concurrent representation] is not 'contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court.' Nor is a failure to extend the Sullivan rule to [a] new context unreasonable either." (internal citations omitted)); Whiting v. Burt, 395 F.3d 602, 619 (6th Cir. 2005) (holding that "expanding Sullivan beyond its present borders of multiple concurrent representation would result in the creation of a new rule of law - one that clearly has not been dictated by prior Supreme Court precedent"); accord Noguera v. Davis, 5 F.4th 1020, 1035-36 (9th Cir. 2021).  But as Tormasi notes on appeal, not all circuit courts agree.  See Tueros v. Greiner, 343 F.3d 587, 594 (2d Cir. 2003) (Sotomayor, J.) (noting that "it may well be unreasonable not to extend Sullivan's definition of an 'actual conflict' to a lawyer whose conflict was defined by representing the divergent interests of a defendant and an important subpoenaed witness"); Rubin v.

_____

[8] Prior to Mickens, we held that the Sullivan exception was not limited to "multiple representation" cases.  See Gov't of V.I. v. Zepp, 748 F.2d 125, 135 (3d Cir. 1984) (recognizing actual conflict where counsel's personal interests were "inconsistent, diverse or otherwise discordant with those of his client and which affected the exercise of his professional judgment on behalf of his client") (internal quotation marks and citation omitted).  While Zepp remains the law in this circuit, the question here is whether the PCR court reasonably applied clearly established federal law as determined by the Supreme Court.

12

Gee, 292 F.3d 396, 402 & n.2 (4th Cir 2002) (recognizing that the state court correctly

utilized the Sullivan framework to analyze a "severe" conflict of interest "between a

client and her attorneys' own personal interests").

We need not decide the issue because, even assuming that White was "actively

representing" Attila Sr. and was conflicted within the scope of Sullivan, Tormasi has not

met his burden to establish that the alleged conflict adversely affected White's

performance.[9]  Sullivan, 446 U.S. at 349-50; see also Mickens, 535 U.S. at 162

(recognizing that "an actual conflict of interest" is "shorthand for the statement in

Sullivan that a defendant who shows that a conflict of *interest actually affected the*

*adequacy of his representation* need not demonstrate prejudice in order to obtain relief").

To prove adverse effect, Tormasi had to show that the actual conflict "cause[d] some

lapse in representation contrary to [his] interests." United States v. Gambino, 864 F.2d

---

[9] It is unclear whether the PCR court addressed this issue.  In rejecting Tormasi's argument that Sullivan governed his claim, it correctly noted that the "mere possibility" of a conflict is insufficient to establish a Sixth Amendment violation; rather, a defendant must show that the conflict adversely affected counsel's performance.  ECF No. 11-76 at 179 (citing Sullivan).  It then stated that Tormasi "suggests that merely because his father might have paid White not to focus on Attilia (sic) Sr.'s motives to kill Francis (sic) Tormasi, his wife, that his criminal conviction should be overturned.  We disagree."  Id. Without explaining why it disagreed, the PCR court pivoted to a Strickland analysis (albeit without citing Strickland).  See id.; see also Strickland, 466 U.S. at 694 (holding that to establish prejudice, defendant must show "a reasonably probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"). We do not decide whether AEDPA deference applies under these circumstances because, even under the more generous de novo standard, the habeas claim fails.  See generally Dennis, 834 F.3d at 281-84.

13

1064, 1070 (3d Cir. 1988) (citation omitted). Such a lapse "can be demonstrated not only by what the attorney does, but by what he refrains from doing." Id.

Tormasi identified four adverse effects which he claimed stemmed from the alleged conflict of interest: (1) White's failure to present "third-party-guilt evidence" at trial implicating Attila Sr. in the murder; (2) White's failure to implicate Attila when questioning him on the stand; (3) White's failure to put Tormasi on the stand to testify regarding "crucial information" implicating Attila Sr. (ECF No. 1-14 at 156); and (4) White's failure to seek dismissal of the charges during plea negotiations in exchange for Tormasi's cooperation and truthful testimony against Attila Sr. We address the first two together, but conclude that none is sufficient to prove a Sixth Amendment violation.

First, Tormasi's actual conflict claim is undercut by the fact that White *did* implicate Attila Sr. in the crime in his opening and closing arguments. For example, he argued that Tormasi was not the only one who had a motive to kill Frances, and, citing the bitter divorce, emphasized Attila Sr.'s anger and animosity towards Frances. White also argued that the evidence suggested "that another person, Attila Senior, may very well have done this." ECF No. 11-90 at 17. While these arguments are not trial evidence, they support the conclusion that White did not feel conflicted about implicating Attila Sr. in the crime.

The record established that Attila Sr. had a solid alibi for the time of the murder, so there was no basis to imply he was the shooter. Tormasi claimed, instead, that it was in his interest "to establish third-party guilt by implicating Attila Sr. in the murder-for-

14

hire scheme with the third-party killer, Michael A. Falcon." ECF No. 1-14 at 144. But he failed to demonstrate that a murder-for-hire defense was plausible. See Hess v. Mazurkiewicz, 135 F.3d 905, 910 (3d Cir. 1998) (recognizing that to establish an actual conflict, a defendant "must identify a plausible defense strategy that could have been pursued, and show that this alternative strategy inherently conflicted with, or was rejected due to, [counsel's] other loyalties or interests").[10]

Tormasi's primary evidence implicating Falcon is Attila's Sr.'s "affidavit," in which he asserts that he hired Falcon to kill Frances. ECF No. 11-76 at 180. But the PCR court discounted the document as "not believable," id., a determination that the District Court correctly concluded was not unreasonable. And, recognizing as much, Tormasi expressly stated that he was not relying on the affidavit "during the current habeas proceeding" or on appeal. ECF No. 12 at 47; Appellant's Br. at 54. We have

---

[10] We emphasize that, as discussed *supra*, the evidence of Tormasi's guilt was significant. While prejudice is presumed – *even if the defendant is guilty* – if the actual conflict affected the adequacy of counsel's performance, see Holloway v. Arkansas, 435 U.S. 475, 489 (1978) (noting "that [a] conviction must be reversed if [the asserted trial error occurred], even if no particular prejudice is shown and even if the defendant was clearly guilty" (alteration in original) (quoting Chapman v. California, 386 U.S. 18, 43 (1967) (Stewart, J., concurring)), we nevertheless may consider the record evidence in determining the impact vel non of the conflict on White's decision making. See, e.g., Gambino, 864 F.2d at 1071-72 (considering record evidence in determining that counsel's decision not to pursue a line of defense was not likely the result of divided loyalties but rather because it was "specious" and would have undermined the credibility of the entire defense); see also Burket v. Angelone, 208 F.3d 172, 186 (4th Cir. 2000).

15

reviewed the other evidence Tormasi referenced, which he presented to the PCR court, and none of it credibly implicates Falcon in a murder-for-hire plot.[11]

Tormasi also pointed to the significant evidence in the record of the acrimonious nature of his parents' relationship and divorce proceedings, including court filings in which Attila Sr. accused Frances of adultery and theft, and a temporary restraining order issued against Attila Sr. based on Frances' complaint that he had physically harmed and threatened her. But, like most of the evidence that Tormasi claimed that White failed to present, this evidence is suggestive only of Attila Sr.'s motive to kill Frances; it does not directly inculpate him in the crime or exculpate Tormasi. Rather than benefit him, the evidence Tormasi proposed – like the questions he claimed White failed to ask[12] – would

_____

[11] For example, Tormasi relies on his parents' "divorce-related documents," including a certification by Attila Sr. stating that he hired Falcon to investigate and surveil Frances, as well as correspondence and surveillance logs from Falcon's investigation of Frances. ECF No. 11-22 at 29, 31, 75-76. In his letters to Attila Sr., Falcon states that he would "perform certain investigations and surveillance, and accommodate "other investigative needs" pursuant to "further advice and instructions," and that he would provide "further assistance" in "any other matter." Id. at 35. Tormasi's argument that these references "clearly indicate[ ] that Falcon was entirely willing to murder Frances at Attila Sr.'s request" is beyond implausible. Id. Equally implausible is his "logic" that because Falcon allegedly rented an apartment from Frances in the Bridgewater boarding home using "factitious (sic) information," "there is no question that Falcon would have taken the scope of his employment to the next logical level by committing murder for Attila Sr." Id. at 36-37 & n.4. Also, it far from "clear," as Tormasi claims, that his evidence, including a flashlight and receipt, establishes that Attila Sr. and "his cohort," Falcon, were in the backyard an hour before the murder. Id. at 74-75.

[12] Tormasi claimed that "counsel's questioning would have narrated defendant's version of events and exonerated defendant from the murder." ECF No. 1-14 at 155. But as discussed, the proposed evidence would not have exculpated Tormasi, and White's questions would not have constituted evidence. See State v. Anastasia, 813 A.2d 601,

16

have supported the state's theory of the case, which was that Attila Sr. encouraged Tormasi to shoot his mother.[13]

Without more, given Attila Sr.'s alibi and the State's evidence indicating that Tormasi was the shooter, he has not shown that the murder-for-hire theory was a plausible defense strategy. Moreover, White called Attila Sr. as a witness to rebut some of the direct evidence linking Tormasi to the crime, and thus it was not in Tormasi's interest to undermine Attila Sr.'s credibility.[14] See Gambino, 864 F.2d at 1071 (recognizing that there is no actual conflict "if an attorney at trial does not raise a defense on behalf of his client because to do so is not in that client's interest even though it is also in the interest of another client that it not be raised"). Therefore, Tormasi has not met his

---

606 (N.J. Super. Ct. App. Div. 2003) (noting that statements by an attorney at a criminal trial "are not evidential").

[13] As previously discussed, the State presented Hamilton's testimony that, according to Tormasi, Attila Sr. wanted him to shoot Frances and her boyfriend. Also, on cross-examination, the State asked Attila Sr., "Didn't you encourage Walter to shoot [Frances'] boyfriend?" and "Didn't you also encourage Walter to shoot your wife, so you would be done with the problem with the divorce?" ECF No. 11-89 at 42. To both questions, Attila Sr. answered, "No, I didn't." Id. He then asserted his Fifth Amendment privilege against self-incrimination. Notably, White did not object to this questioning, and, at sidebar, he took no position on the issue, stating, "I'm just sucking it in and letting him cross-examine, and I'll object when I think it's appropriate. But I'm not going to say anything about this question now." Id. at 43. We note that this approach undermines Tormasi's claim that White labored under a conflict.

[14] For example, White called Attila Sr. to testify that Tormasi's fingerprints were on the chair outside Dougherty's boarding house room because he picked it up when he and Attila Sr. went there to clean. Attila Sr. also contradicted the State's case by testifying that Tormasi did not have a 9-millimeter gun and did not hate his mother.

burden to demonstrate that White failed to implicate Attila Sr. in the crime, either by presenting the proposed evidence or by asking the proposed questions, because he was conflicted.

Next, Tormasi claimed that White "failed to place [him] on the witness stand" because his testimony "would have been detrimental to Attila Sr." ECF No. 11-42 at 33. But he did not present any evidence which supports that claim.[15] Tormasi advised the trial court that he and White "decided that it would be best for me not to testify." ECF No. 90 at 2. The record suggests that this was a tactical decision made in consultation with his family, and not the result of an alleged conflict.[16]

Likewise, there is no support for his final contention that White failed to engage in meaningful plea negotiations because he was conflicted. Tormasi admitted that White entered into plea discussions regarding the length of his sentence. However, he claimed

---

[15] At the PCR hearing, Tormasi claimed that he had "privileged information" about the murder-for-hire scheme "consist[ing] of personal observations" that would have incriminated his father, but he never identified what that information was, let alone supported that claim with evidence. ECF No. 11-98 at 19, 22-23.

[16] At the close of its case, the State noted for the record that if Tormasi were to take the stand and contradict statements that he made to the police, and which the Court had suppressed, it intended to introduce them. The statements, taken shortly after the shooting, were incriminating; among other admissions, Tormasi stated that he had recently fired a gun when asked if gun residue would be found on his clothing. White responded to the State that he understood and "[t]hat is why I have to talk to [Tormasi]" about testifying. ECF No. 11-89 at 24. The trial court then advised Tormasi about his right to testify, explaining that he would be subject to cross-examination. Tormasi made the decision not to testify shortly thereafter.

18

that, "[h]ad [White] offered [Tormasi's] truthful testimony against Attila Sr. for plea-bargaining purposes, [Tormasi] could have secured the dismissal of the charges against him." ECF No. 11-42 at 33. Because the evidence indicated that Tormasi, not Attila Sr., was the shooter, and Tormasi failed to support his murder-for-hire plot, there is no basis to conclude that the plea negotiations were adversely affected by an alleged conflict, let alone that the charges would have been dismissed.

In sum, we conclude that Tormasi has failed to show that White labored under a conflict of interest that adversely affected his performance, and, therefore, that his counsel was not ineffective under Sullivan. We need not consider the propriety of the District Court's conclusion that Tormasi failed to demonstrate ineffective assistance of counsel under the more demanding Strickland standard because Tormasi has consistently argued that his actual conflict claim was governed by Sullivan, not Strickland. See Tueros, 343 F.3d at 592 (declining to address the ineffectiveness claim under the Strickland standard, after determining that Sullivan did not apply, where the petitioner had failed to present a Strickland argument).

Based on the foregoing, we will affirm the judgment of the District Court.