[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
June 15, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-14253

_____

D. C. Docket No. 03-00536-CV-ORL-18JGG

MARK DEAN SCHWAB,

Petitioner-Appellant,

versus

JAMES V. CROSBY, JR., Secretary,
Florida Department of Corrections,
CHARLIE CRIST,
Attorney General,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(June 15, 2006)**

Before DUBINA, CARNES and HULL, Circuit Judges.

CARNES, Circuit Judge:

So far as we know, the first time that Mark Dean Schwab sexually assaulted a young male was in the fall of 1986, when Schwab was seventeen years old. His victim was a younger, slightly built (4'10" tall, 85 lbs.), high school sophomore whose first name, which is all we will use, was Warren. On his way to school in Brevard County, Florida one morning, Warren walked by Schwab's truck in the parking lot of a bank near the school. Schwab asked Warren to help him start the truck, which he did, although the truck started easily. Warren then made the mistake of accepting Schwab's offer of a ride to school. As soon as Schwab drove the truck out of the parking lot, he grabbed Warren's hair, pulled Warren's head into his lap, and put a knife against his throat. Schwab drove the truck down some winding dirt roads and eventually parked it so that a tree blocked the passenger door.

With Warren trapped inside the truck, Schwab ordered him to remove his shorts. He then began to masturbate Warren. After a few minutes he ordered Warren to masturbate himself and he performed oral sex on Warren. Schwab's assault on Warren lasted 30 to 45 minutes. Afterwards, he drove Warren to the high school and threatened to kill him if he told anyone what had happened. Two days later, as Warren was again walking to school, Schwab pulled up alongside him, gave him a $20 bill, and thanked him for not telling anyone. Warren did not

2

see Schwab after that and did not come forward about the crime until he heard about the disappearance of the young boy in this case, which happened five years later.

In the meantime, Schwab's next known sexual assault occurred during the summer of 1987. This time his victim, first name Than, was a thirteen-year-old boy (between 5'3" and 5'6" tall). In order to get his hands on Than, Schwab called the boy and his family, telling them he had adopted a dog that they had given to a local pet shelter. He said that he needed their advice about how to care for the dog. Using that ruse, over the next few weeks Schwab visited Than's home in Brevard County several times, ingratiating himself with the family.

About three weeks after first meeting Than, Schwab called him one morning and told him that he had a house painting job on which he could use some help. Schwab promised to give Than half of the $400 that he expected to be paid for the work. Than agreed, and a little while later Schwab picked him up. Instead of driving Than to the painting job, Schwab took him to his house. Immediately after the two walked inside Schwab's house, he stuck a knife to Than's throat. Schwab then forced Than to take off his clothes, bound his hands behind his back with a cord, and blindfolded him. Schwab touched Than's penis and orally molested him. Schwab then forced the thirteen-year-old boy to lie on his stomach on a couch and

3

anally raped him. The entire ordeal lasted several hours, all morning and into the afternoon. Than blacked out during part of it.

Afterwards, Schwab untied Than, allowed him to dress, and drove him home. Schwab told Than not to tell anyone and promised that he would put $200 in Than's mailbox the next day if he would keep quiet. Than had a small cut on his throat from the knife and had bruises on his arms from being tied up. He reported what had happened to him, and Schwab was charged with sexual battery under Florida law. He confessed and pleaded guilty to the sexual battery charge, Fla. Stat. § 794.011(3) ("A person who commits sexual battery upon a person 12 years of age or older, without that person's consent, and in the process thereof uses or threatens to use a deadly weapon is guilty of a life felony."). That crime was punishable by " a term of imprisonment for life or by a term of imprisonment not exceeding 40 years." Id. §§ 775.082(3)(a), 794.011(3). He did not receive nearly that much punishment. Instead, on March 18, 1988, Schwab was sentenced to only eight years in prison. Unfortunately, and tragically, he did not serve his full sentence or even half of it.

In early March of 1991 Schwab was released from prison in Florida. See Schwab v. State, 636 So. 2d 3, 4 (Fla. 1994). His early release was not because he had received any type of treatment. He hadn't. Although he had been tentatively

4

accepted into a sex offender program for inmates, before Schwab could complete the screening process that program was ended because of budget cuts. Still, even without treatment, Schwab was released from prison on probation only three years after he was given an eight-year sentence. He was required to participate in a sexual offender therapy program as a condition of his probation. In less than a month after his release, and during the time he was participating in the program, Schwab had found another victim.

Junny Rios-Martinez was an eleven-year-old boy, who was 5' tall and weighed 76 pounds. He won a kite-flying contest which led to his picture being published in the March 21, 1991 edition of Florida Today, a local newspaper in Brevard County, Florida. Children are often excited to see their pictures in the newspaper, and Junny could not have suspected that it would ultimately cost him his life.

The day after Junny's photograph ran in the paper his mother received a phone call from a man identifying himself as Malcom Denemark and saying that he was from the newspaper. The man told Mrs. Rios-Martinez that he had seen Junny's picture in the paper and wanted to interview Junny for another article. He called back later that day while Junny was at home and was allowed to speak with him. Junny agreed to be interviewed, and his mother and the man arranged for it to

take place at the Rios-Martinez home before Junny's baseball game the following day.

That next day, which was Saturday, March 23, Schwab went to Junny's home for the interview and introduced himself as "Mark Dean." Schwab explained that Denemark, his associate from Florida Today, could not make the interview because of a conflict but that he was prepared to conduct it for Denemark. Schwab carried a spiral notebook with handwriting on several pages, which he said were questions that Denemark had prepared for the interview. Schwab did not work for any publication (he had a construction job), and he was not an associate of anyone named Malcolm Denemark. But neither Junny nor his mother knew that, and they certainly did not know the person they had let into their home was a child molester who had just gotten out of prison.

During the interview, Schwab sat on a couch in the living room, Junny sat across from him in a rocking chair, and Mrs. Rios-Martinez sat on the couch just a few feet away. Schwab asked Junny about the things he liked to do, his favorite subject in school, his grades, whether there were drugs in school or peer pressure, and about cars. Junny showed Schwab his baseball and surfing trophies, and Schwab told Mrs. Rios-Martinez: "You must be very proud of him." He gave Junny a gift certificate to McDonald's on which was written "To: Junny. From:

6

Florida Today (Mark)."

After the interview was over, Schwab told Mrs. Rios-Martinez that he would like to interview Junny again for another, potentially national, story and that Junny should attend a photo shoot for the story at Florida Today's offices the next Monday. Mrs. Rios-Martinez agreed and told Schwab that he could also take photos of Junny playing drums at a club where his father worked on Sundays. Schwab asked Mrs. Rios-Martinez if he could go with them to Junny's baseball game that evening, telling her that he wanted to see Junny playing and get to know him and his family better. Mrs. Rios-Martinez consented to that, and Schwab spent a half hour at Junny's baseball game that night.

Schwab did not show up at the club to take photographs of Junny on the next Sunday. He called Mrs. Rios-Martinez that night and told her his deadline on the story had been extended and the photo shoot canceled. The next day, Schwab called again. This time he told Mrs. Rios-Martinez that he would no longer be involved with the article for Florida Today, because he had taken a new position with a surfing magazine. In this way, Schwab began to exploit the information he had gained about Junny's interest in surfing during his visit to their home.

Two days later Mrs. Rios-Martinez and her husband received a letter from Schwab. In it he told them that their family was a special one, unlike any other he

7

had ever met, and that he could tell all of the family members (there were two other children) loved each other very much. The following Sunday, which was Easter, Schwab personally delivered an Easter card to the Rios-Martinez family. Mrs. Rios-Martinez was at home alone. She and Schwab discussed the letter he had sent her and her husband. She told Schwab "that it had affected [her] deeply, emotionally and that [she] was very affected by and very moved by what he had written about [her] family."

They also discussed the new job Schwab claimed to have. He told Mrs. Rios-Martinez that he had gained a lot of contacts with surfing companies and that he would like to help Junny get sponsored by one of them. He asked her to write up a resume for Junny and to get together some pictures of him that Schwab could take to his contacts. She did.

Three days later Schwab told Mrs. Rios-Martinez that a surfing company was interested in sponsoring Junny. Later in the week, she put together more pictures of Junny, and Schwab came by the house and picked them up. He then told Mrs. Rios-Martinez that he wanted to take Junny to Daytona Beach to meet people from the surfing company over the weekend. That did not happen because the family was not able to make the necessary arrangements.

The following week Schwab dropped by the Rios-Martinez household and

told them that a surfing company, which he named, had agreed to sponsor Junny. He brought Junny a t-shirt with the company's logo. Schwab told Junny that he could have whatever surfboard he wanted and that he could even design it himself. He said that the company also would provide Junny with surfing clothes.

Over the next several days Schwab visited the family several times. He worked with Junny on designing his surfboard and clothes. He told Mrs. Rios-Martinez that he had met with the president of the surfing company, and he hand-delivered to Mrs. Rios-Martinez forged documents, purporting to be a sponsorship letter and contracts. Schwab provided the family with a list of the surfing tournaments that he claimed Junny would participate in.

During one of his visits with them Schwab again asked Junny's parents if he could take Junny to Daytona Beach to meet with the surfing company. They agreed. Schwab told them that he would pick Junny up at 10:00 a.m. on Sunday, April 14, 1991. That morning, however, he called and cancelled the trip. Mr. and Mrs. Rios-Martinez did not hear from Schwab again. Their son did.

Thursday, April 18, 1991, began like any other school day for Junny. At about 7:00 a.m., he left home for his sixth grade class at Clearlake Middle School in Brevard County. He may have been anxious about the baseball game he was going to play in that evening.

9

At about 2:15 p.m. that day a bookkeeper at Junny's school received a phone call from a man purporting to be his father. The man told her to deliver a message to Junny: "I'd like for him not to go home on the bus. I would like for him to meet me at the ball field." Believing the man to be Junny's father, she contacted Junny's classroom, had him sent to the office, and gave him the message.

At about 3:00 p.m. that day, one of Junny's schoolmates walked with him for a short while toward the baseball field. She saw him jump the fence into the baseball field. Another of Junny's friends later saw him and "some tall guy" getting out of a U-Haul truck. A short while later, the friend went back by the park but the truck, the man, and Junny were gone.

Junny's baseball game started at 6:30 that evening. Mrs. Rios-Martinez went to the baseball field right after work, arriving shortly after 7:00 p.m. Junny was not there. Her husband, who was also at the park, had not seen Junny. Mrs. Rios-Martinez immediately left for home, but Junny was not there either. She called Schwab at the number he had given her but was unable to reach him. Later that evening she and her husband reported their son missing.

Early the next morning, April 19, Schwab learned from his mother that the police had been to the apartment he shared with her and wanted to question him about a missing child. About forty-five minutes later, Schwab called his mother

10

and told her that he was going to see his probation officer. He did not. Instead, in the late afternoon of the next day, April 20, he called his aunt in Port Washington, Ohio, nearly a thousand miles from Cocoa, Florida. Schwab told her that a man named "Donald" had forced him at gunpoint to kidnap a boy named Junny. Schwab said that Donald had threatened to kill his mother if he did not do so. Schwab also told his aunt that Donald had forced him to have sexual relations with the young boy.

The next day, April 21, Ms. Kinsey was visited by law enforcement officers who were looking for Schwab in connection with Junny's disappearance. While they were at Ms. Kinsey's home, Schwab called. He called back later that day and the officers were able to trace the call to a nearby town where they arrested him while he was at a pay phone still talking with his aunt.

The night he was arrested Schwab voluntarily gave a recorded statement to law enforcement officers. Schwab's story, as recounted in that statement, is this. A man he identified as "Donald" confronted him outside a bar at about 2:00 a.m. on the Sunday before Junny disappeared, which would have been April 14, 1991, and threatened to get him put back behind bars. On Monday, April 15, Schwab received a call threatening to frame him for sexually assaulting a boy unless Schwab bought a motorcycle for another man. Because of those two threats

11

Schwab rented a U-Haul truck—he said he did it to make him look less conspicuous—and he checked himself into a motel in Cocoa Beach, Brevard County.

According to Schwab's story, on Thursday, April 18, Donald accosted him at a restaurant near the motel and forced Schwab into his car at gunpoint. Donald drove him to a field and threatened to kill his mother if Schwab did not do everything he was told. Donald then drove the two of them to a pay phone Donald used to call Junny's school pretending to be Mr. Rios-Martinez and leaving the message that Junny should go to the baseball field after school. After making that call Donald took Schwab back to the U-Haul truck and warned Schwab that he had better return to his motel room with "some kid" or else his mother "was going to be dead." Schwab immediately went in his U-Haul truck and picked up Junny at the baseball field.

Schwab claimed that shortly after he returned to his motel room with Junny, Donald entered the room, locked the door behind him, drew his gun, and told Schwab: "Now I got you, you son of a bitch." Donald used duct tape to bind Junny's hands behind his back and a knife to cut Junny's clothes off of him. Donald told Schwab that he "was going to have to do something to this kid sexually." When Junny started to cry, Donald struck him "a couple times" and

12

then taped his mouth shut. Donald then put his gun to the back of Schwab's head and forced him to have anal intercourse with Junny.

Schwab also told the officers that Donald forced him to leave the motel and told him not to come back for several hours. When Schwab returned to the hotel room sooner than he should have, Donald ordered him to pick up and handle a black footlocker that was in the room. Donald again forced Schwab to leave. After five or six hours, Schwab returned to the motel room but Donald and Junny were no longer there.

Schwab claimed that he did not know where Junny was. The officers returned him to Florida on April 23, 1991. While they were traveling from the airport to the police station, Schwab told one of the officers that he wanted to look for Junny's body. For several hours during that rainy, overcast afternoon and into the night, Schwab directed the officers accompanying him to various locations in Brevard County. At about 10:00 p.m., Schwab led the officers to a largely undeveloped part of the county. Once there Schwab walked down an unpaved road, stopped, began pacing around in the road, and then pointed into the woods.

The search team crossed a drainage ditch and walked into the woods in the direction that Schwab pointed. Not far from the road, they saw a small footlocker tied nearly shut with rope and covered with palm fronds and debris, which

13

obviously had been placed there to hide it. The lid of the footlocker was slightly open and a white cloth was visible inside. Even from ten feet away, the team could tell from the smell that a human body was inside. It had been five days since Junny was last seen alive.

The officers took the footlocker to the Medical Examiner's office where it was carefully examined. When the ropes tied around the footlocker were cut and the lid opened, there was a blanket that had several stains on it. Under the blanket was a small boy's naked body in a "semi-fetal position." His face was not recognizable because of decomposition, but through fingerprints the body was identified as that of Junny Rios-Martinez.

Also found inside the footlocker were a pair of shoes, socks, underwear, shorts, a shirt, a watch, a yellow medal, a gold chain, two towels, some pieces of wadded-up duct tape, and a manila folder. Mrs. Rios-Martinez identified the clothing and jewelry items as belonging to her son. Some of the clothing she had bought for him the prior Easter, and the gold chain was a family heirloom his father had passed on to Junny.

An autopsy determined that Junny had died from "mechanical asphyxia," probably smothering or strangulation. In spite of the decomposition, signs of possible bruising around the anus were detected. One of the pieces of tape that had

14

been wadded up in the footlocker had Schwab's fingerprint on it.  A search of Schwab's car led to the discovery of a receipt from a K-Mart.  The receipt, dated April 18, 1991, the day Junny was abducted, showed the purchase of a footlocker.

After Junny's body was found, Schwab gave another statement to officers. In it he retold his story about a man named Donald forcing him to kidnap and rape Junny.  This time, however, Schwab added that after he had intercourse with Junny, Donald had forced him and Junny, who was still alive, to get into the U-Haul that Schwab had rented.  Donald drove them around various locations near Cocoa while discussing where he could dump Junny's body so that Schwab would be blamed for his death.  One of those locations was near where Junny's body was found.  Donald then returned Schwab to the motel and told him to "get lost" and not to come back for several hours.  When Schwab returned the next morning he saw Donald carrying the black footlocker, which Donald handed to Schwab.  He then ordered Schwab to leave again.

According to Schwab's supplemental story, after he returned to the motel a few hours later Donald forced him into his car and drove him out to where the footlocker was.  He ordered Schwab to walk into the woods where Schwab spotted the footlocker.  Donald then returned Schwab to the motel and threatened him for the last time.  The next day, Schwab said, he drove to Ohio.

15

The state trial court judge, after hearing all of the evidence at a bench trial and sentence hearing, rejected Schwab's story about another man being involved and found that Schwab had acted alone. He found that Schwab had planned things so that the young victim left the baseball field thinking he was with a trusted friend. Once in the motel room, Schwab physically overpowered the slightly built child. He bound with duct tape the little boy's hands, his mouth, and part of his face. He took a knife and violently cut off the child's clothes, leaving him naked, crying, and terrified. He punched him twice in the stomach. He put a bed sheet or mattress cover over the head of the little boy who was so scared that he started to shake. Schwab anally raped him. The victim did not even have the solace of unconsciousness during the ordeal, which lasted a substantial amount of time. He continued to cry throughout, stopping only when Schwab finally strangled or smothered him to death. See Schwab, 636 F.3d at 7 n.6 (quoting from the trial court's findings). A few days before his brutal abuse of eleven-year-old Junny, Schwab had attended a group therapy session as part of the sexual offender program that was a condition of his probation.

## I.

Schwab and his defense counsel made a strategic decision to waive a jury. Id. After a week-long trial, the trial judge convicted Schwab on all counts as

16

charged. Id. At a penalty proceeding before the judge, the evidence that was presented on mitigating circumstances included the opinions of a number of mental health experts.

Dr. Fred Berlin, a psychiatrist who is head of the sex offender program at Johns Hopkins University, interviewed Schwab in October 1991 and prepared a report on his behalf. There is no copy of Dr. Berlin's report in the record before us, but according to Schwab's brief to the Florida Supreme Court, Dr. Berlin diagnosed him as having "a paraphiliac disorder which consisted of homosexual pedophilia and sexual sadism." This disorder caused Schwab to "find [that] young males are a powerful sexual attraction" and to become "even more aroused if humiliation and pain are involved." In Dr. Berlin's opinion Schwab's disorder is "a serious psychiatric illness" that is "not due to any voluntary decision on [Schwab's] part."

Dr. Howard Bernstein, a licensed psychologist, who also evaluated Schwab, testified for him at sentencing. Dr. Bernstein found no evidence that Schwab had any psychosis, formal thought disorder, major mood disorder, or any other mental disorder. Instead, he found Schwab to be "rational and realistic" when interviewed but added that "his social judgment and thinking is clearly impaired within a very narrow range of interest and concerns, and that's the sexual concern." He

17

described Schwab as being "preoccupied with sexual concerns," and "profoundly driven by these cravings," and as having "immature judgment at the very least." Dr. Bernstein also believed that Schwab likely uses what he described as "false memories" in order to justify his inappropriate sexual behavior and "to blame others" for it.

Dr. Bernstein explained that Schwab's acting out sexually likely begins as a "fantasy" that "gives arousal" during which Schwab becomes "fixated" on a victim who fits his sexual predilection—"[y]ounger boys, same gender, smaller stature." In order to fulfill his "obsessive sexual preoccupation," Schwab takes a "ritualistic" approach involving "preplanning" and "schemed" events. His fantasy is fueled by his excitement and arousal, as well as by aggression and control. Schwab contemplates only the positive consequences of his actions: "Orgasm, satisfaction, completion, authority, revenge." In order to justify acting on his fantasy, Schwab must "distort[] real events to justify his behavior to . . . reduce his guilt."

According to Dr. Bernstein, after Schwab's preplanning and scheming phase, there is "hyperaggressiveness" marked by "increased physiologic arousal [and] sexual excitement." Schwab begins to "transfer his fantasies to a real . . . victim, and that leads to the next stage, victim seeking behavior." Once Schwab locates a victim that meets his fantasy, he begins "a fantasy rehearsal process."

18

The "mode of gratification" used by Schwab is "sex, . . . humiliation, . . . [and] sadism." It is at this point, Dr. Bernstein believes, that Schwab loses control, his fantasy becomes an "irresistible impulse," and Schwab "has an incapacity to stop." Schwab has rationalized, minimized, and, ultimately, denied the possibility of any negative consequences from his action and has given himself "permission . . . for the assault." The conclusion of this process is for Schwab to act out his fantasized sexual aggression.

Under cross-examination, Dr. Bernstein acknowledged that Schwab had been able to control his desires for the several weeks during which he attempted to lure Junny away from his parents. Schwab was also rational in understanding that he would not be able to fulfill his desires unless he succeeded in being alone with Junny. Dr. Bernstein testified that Schwab's disorder likely progressed from the time of the crime involving Than to the later one involving Junny. He conceded that being punished for the 1987 crime against Than may have taught Schwab that in order to fulfill his desires while protecting himself from punishment he needed to kill his victim.

Dr. Bernstein was of the opinion that Schwab knows he is ill, exhibits signs of guilt about his victims, and is "in constant turmoil" about it. However, he also described Schwab as "egocentric" and "perhaps narcissistic," stating that "[h]e

19

wanted to use people for his own pleasure." Overall, Dr. Bernstein summed up Schwab as "[d]amaged goods," a "sick child . . . with sexually disordered behavior in an adult body," and "[c]ertainly dangerous by history." In his opinion, Schwab showed "a low potential for change" and was one for whom "[r]ehab programs are unlikely to succeed."

Dr. William R. Samek, a clinical psychologist specializing in treating sexual offenders and sexual abuse victims, testified as a rebuttal witness for the prosecution. Dr. Samek disputed Dr. Bernstein's conclusion that Schwab's sexual desires became "irresistible impulses" which he could not control. In Dr. Samek's view, such impulses can be resisted "if there's sufficient motivation to stop." He believed that Schwab's known assaults showed a progression and "that [Schwab] ha[d] learned each time to do things better, more carefully and slicker."

Dr. Samek believed that Schwab is not a pedophile but that he has "an antisocial personality disorder" and is a "rape/murderer and mentally disordered sex offender." As a result, Schwab "would have been more difficult to treat . . . than your average pedophile." Dr. Samek concluded that "it is highly unlikely that [Schwab] could be successfully rehabilitated and be safe without a lot of controls around him."

In support of that conclusion, Dr. Samek noted that Schwab's "offenses were

very cool, calm, [and] carefully planned," that Schwab went "well beyond what is needed to rape or even to [molest] . . . a kid," and that Schwab "went to extreme lengths to . . . seduce . . . and charm the family." Dr. Samek found this last point notable because "most child molesters choose victims who are easily molestable." He testified that Schwab's choice of "good kids from good families who are happy" reflects "his own resentment that he didn't have a nice family" and that Schwab "gets back" at his victims "by destroying them." Dr. Samek also based his conclusion that Schwab is not treatable on the fact that he exhibited "a tremendous amount of remorse while in prison" but "that didn't stop his behavior when he got out."

After considering all of those expert witness opinions and more evidence offered in support of aggravating and mitigating circumstances, see Schwab, 636 So. 2d at 7–8, the state trial court judge found that the aggravating circumstances outweighed the mitigating circumstances and sentenced Schwab to death. See id. at 7. The conviction and sentence were affirmed on direct appeal, id. at 8, and state collateral relief was denied, Schwab v. State, 814 So. 2d 402 (Fla. 2002).

Schwab filed a petition in the district court seeking relief pursuant to 28 U.S.C. § 2254. A habeas petitioner in custody under a state court judgment is entitled to that relief if "the state court judgment rests on a decision that 'was

21

contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" Hunter v. Sec'y, Dep't of Corr., 395 F.3d 1196, 1202 (11th Cir. 2005) (quoting 28 U.S.C. § 2254(d)). The district court denied Schwab's petition for a writ, and this is his appeal from that denial.

## II.

We granted a certificate of appealability on five issues. The one that Schwab has emphasized in his briefs and oral argument to us has to do with an asserted conflict of interest that he says affected his trial counsel. This claim was discussed and rejected by the Florida Supreme Court on direct appeal. See Schwab, 636 So. 2d at 5–6.

The facts related to this claim, briefly, are these. On March 23, 1992, two months before Schwab's trial was set to begin, a letter addressed to one of his court-appointed counsel at the public defender's office was delivered to that office. The letter was opened by a secretary and examined by the executive director of the office, two attorneys, and two investigators. The author of the letter, which was handwritten, said that his name was "Doug." In the letter Doug claimed that he had murdered Junny and said that he "should have killed Schwab like [he] planned." The letter indicated that Doug knew Schwab had told the police about

22

Doug committing the crime. (Actually, Schwab had told the police about "Donald" committing the crime, but apparently insofar as the letter writer was concerned the two were one and the same.) Because Schwab had ratted him out to the police, Doug threatened in the letter to abduct, torture, and kill one of Junny's younger brothers because Schwab had told the investigating officers about Doug. The letter did not explain how Doug—or Donald—knew what Schwab had told the officers.

On March 25, 1992, two days after receiving the letter, the public defender's office informed the police about it and the next day handed it over to law enforcement. Afterwards, the letter was tested and found to have Schwab's fingerprints on it.

On April 20, 1992, attorneys from the public defender's office had been representing Schwab in the case for nearly a year. On that date one of them filed a motion requesting that the entire office be allowed to withdraw from further representation. The stated grounds were that the prosecution planned to use the "Doug" letter against Schwab at trial, and employees of the public defender's office would be called as witnesses to testify about the chain of custody of the letter. The motion admitted that the "Doug" letter had been received by the public defender's office on March 23, handled by six employees at the office, and given

23

to law enforcement three days after it was received. At a hearing on the motion to withdraw, Schwab's chief trial counsel argued that he could not effectively cross-examine any of his co-workers at the public defender's office to test their credibility because of his professional and personal relationships with them. Counsel also refused to stipulate to the chain of custody of the letter even though no factual basis for contesting it had ever been suggested. The trial court denied the motion to withdraw.

The State called five members of the public defender's office to testify to the chain of custody of the letter. Schwab's trial counsel insisted that he could not cross-examine them, and he did not. The trial judge questioned two of the witnesses after the prosecution concluded its examination of each of them. The judge asked the first witness, a secretary with the public defender's office, about her job duties, how mail is processed at the public defender's office, what she did with the letter after she opened it, what the letter looked like and whether she read it, whether the copy of the letter introduced into evidence was the same as she remembered it, whether anyone else had come into contact with the letter while it was in her control, and whether she had personal knowledge of who wrote the letter. None of her answers helped the defense. The judge asked the second witness, also a secretary, whether she had personal knowledge of who wrote the

24

letter, whether she had read it or had changed or altered it, whether the copy used at trial was the same as she remembered it, and whether she was acting in the normal course of business in handling the letter. None of her answers helped the defense, either.

On direct appeal Schwab argued that he had been denied effective assistance of counsel because his attorneys "were placed in the unenviable position of discharging their duty of advocacy on behalf of their client at the risk of perhaps alienating those persons with whom they work on a daily basis." The Florida Supreme Court held that Schwab had failed to meet his burden of showing "substantial prejudice" from the public defender's office's continued representation of him. Schwab, 636 So. 2d at 5–6. The court reasoned that the testimony of the public defender employees "went to establish the collateral matter of the letter's chain of custody." Id. at 6. Not only that, but "[t]he facts establishing that [chain of] custody had been set out in the motion to withdraw and were not in dispute." Id.

In his federal habeas petition Schwab asserted that his Sixth Amendment right to effective assistance of counsel had been violated because of the state trial court's denial of his trial counsel's motion to withdraw based on a conflict of interest, which caused "counsel [to] refuse[] to cross-examine the witnesses from

25

the . . . Public Defender's Office and test the credibility and reliability of the witnesses['] testimony." See U.S. Const. Amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."); Strickland v. Washington, 466 U.S. 668, 688, 104 S. Ct. 2052, 2065 (1984) (stating that one of the "basic duties" of a criminal defense attorney is "a duty of loyalty, a duty to avoid conflicts of interest").

In resolving this claim the district court applied both the general two-prong ineffective-assistance-of-counsel standard of Strickland, 466 U.S. at 687–96, 104 S. Ct. at 2064–69, and the more specific conflict-of-interest standard of Cuyler v. Sullivan, 446 U.S. 335, 345–50, 100 S. Ct. 1708, 1716–19 (1980). It concluded that under either standard there was no constitutional violation. "When reviewing the district court's denial of a habeas petition, we review questions of law and mixed questions of law and fact de novo, and findings of fact for clear error." Nyland v. Moore, 216 F.3d 1264, 1266 (11th Cir. 2000).

A.

Strickland requires a defendant seeking to have his conviction or death sentence reversed on ineffective assistance grounds to establish "that counsel's representation fell below an objective standard of reasonableness" measured against "prevailing professional norms," 466 U.S. at 688, 104 S. Ct. at 2064–65,

26

and "that the deficient performance prejudiced the defense," id. at 687, 104 S. Ct. at 2064. Prejudice exists where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S. Ct. at 2068. Where there is no prejudice, a court need not decide if the performance failed to meet required standards. Id. at 697, 104 S. Ct. at 2069.

Without addressing the performance question, the district court denied the claim because Schwab had not shown that he was prejudiced by his counsel's failure to cross-examine and attack the credibility of the witnesses from the public defender's office. The court's reasoning was that those witnesses "merely provided testimony regarding the chain of custody of the letter, which was not in dispute."

Cross-examination is important, a key "adversarial function." See Polk County v. Dodson, 454 U.S. 312, 320, 102 S. Ct. 445, 451 (1981); accord Nix v. Williams, 467 U.S. 431, 446, 104 S. Ct. 2501, 2510 (1984) ("The Sixth Amendment right to counsel protects against unfairness by preserving the adversary process in which the reliability of proffered evidence may be tested in cross-examination."). It is one of the most important tools in the arsenal of

competent defense counsel. The Supreme Court recognized in Strickland that one of the "basic duties" of an objectively reasonable defense counsel is "to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." 466 U.S. at 688, 104 S. Ct. at 2065. Our system of justice "assumes that adversarial testing will ultimately advance the public interest in truth and fairness." Dodson, 454 U.S. at 318, 102 S. Ct. at 450; see also Greene v. McElroy, 360 U.S. 474, 497, 79 S. Ct. 1400, 1414 (1959) ("'For two centuries past, the policy of the Anglo-American system of Evidence has been to regard the necessity of testing by cross-examination as a vital feature of the law. The belief that no safeguard for testing the value of human statements is comparable to that furnished by cross-examination, and the conviction that no statement (unless by special exception) should be used as testimony until it has been probed and sublimated by that test, has found increasing strength in lengthening experience.'") (quoting 5 Wigmore on Evidence § 1367 (3d ed. 1940)).

It is easy to assume that a defense counsel who fails to cross-examine a group of witnesses for wrong-headed, non-tactical reasons is performing deficiently, at least if there is anything helpful to the defense that he could have asked them. Here, it is not apparent that there was. The district court did ask some questions of a couple of those five witnesses, but those questions were geared

28

toward clarifying the witnesses' testimony, not probing their credibility. In any event, we will assume that counsel's failure to attempt any cross-examination of any of the five chain of custody witnesses was deficient performance.

That does not matter to the disposition of this claim, however, because Schwab has made no showing at all that there is a reasonable probability of a different result in the trial if his counsel had cross-examined some or all of the five witnesses to the letter's chain of custody. The motion to withdraw laid out all of the relevant facts regarding the chain of custody of the letter: when and where it was received, to whom it was addressed, who opened it, who else possessed it or handled it, and when it was turned over to the police. Schwab's counsel set out those facts in the motion because they were not subject to dispute on any reasonable basis. There was not much else for any of the five witnesses to say on the subject other than to attest that the letter had not been altered since leaving their possession, which they did. As the state trial court, the Florida Supreme Court, and the district court observed, the chain of custody of the letter was essentially undisputed.

Schwab has the burden of affirmatively proving prejudice, and aided by new counsel, he still has not suggested any evidentiary basis for attacking either the chain of custody or the credibility of the five employees of the public defender's

29

office who testified to it. Counsel cannot manufacture evidence, and the

Constitution does not require the presentation of evidence that does not exist. Nor

does counsel have a duty to ask questions implying facts that he knows are not

true. See Nix v. Whiteside, 475 U.S. 157, 175–76, 106 S. Ct. 988, 998–99 (1986)

(holding "as a matter of law" that federal habeas petitioner could not show

prejudice by his counsel's refusal to allow him to perjure himself at trial "[e]ven

. . . assum[ing] that the jury might have believed his perjury"); Van Poyck v. Fla.

Dep't of Corr., 290 F.3d 1318, 1323 (11th Cir. 2002) ("[A] lawyer need not

embrace his client's fraud."); Putman v. Head, 268 F.3d 1223, 1246 (11th Cir.

2001) ("Although an attorney has an ethical duty to advance the interest of her

client, that duty is limited by an equally solemn duty to comply with the law and

standards of professional conduct.") (internal quotation marks, alteration, and

citation omitted); Davis v. Singletary, 119 F.3d 1471, 1475 (11th Cir. 1997) ("The

duty to render effective assistance of counsel does not include the duty to present

false or misleading testimony."); Bush v. Singletary, 988 F.2d 1082, 1092–93

(11th Cir. 1993) ("We agree with the district court that 'Strickland does not compel

an attorney to urge an argument which he reasonably finds to be futile, let alone

one he finds to be false.'") (quoting district court opinion); Scott v. Dugger, 891

F.2d 800, 803 (11th Cir. 1989) ("[A]ppellant's lawyer could not have rendered

30

ineffective assistance by failing or refusing to present a false defense."). Schwab has not shown that the letter's authenticity legitimately could have been called into question and ruled inadmissible if only his counsel had cross-examined the chain of custody witnesses.

Nor has Schwab convinced us that pulling the letter from the pile of evidence against him would have resulted in a reasonable probability of a different verdict or sentence. Our confidence in the outcome of the trial and sentence proceeding is not undermined in the least by this asserted failure of trial counsel. See Strickland, 466 U.S. at 695–96, 104 S. Ct. at 2069 (instructing that in determining prejudice a court should consider all of the evidence unaffected by the failure of trial counsel).

## B.

Schwab contends that even if he loses on a straight up inquiry into prejudice under the general Strickland rule for errors and omissions of counsel, he should still win on the theory that the limited presumption of prejudice announced in Cuyler v. Sullivan applies. The Supreme Court held in Sullivan that, at least in cases of concurrent multiple representation, a defendant is presumed to be prejudiced where he can show (1) "that his counsel actively represented conflicting interests" and (2) that the conflict "adversely affected his lawyer's performance."

31

Sullivan, 446 U.S. at 350, 100 S. Ct. at 1719; see also Strickland, 466 U.S. at 692, 104 S. Ct. at 2067. "[T]he possibility of conflict is insufficient to impugn a criminal conviction." Sullivan, 446 U.S. at 350, 100 S. Ct. at 1719. This was an extension of the rule announced in Holloway v. Arkansas, 435 U.S. 475, 98 S. Ct. 1173 (1978), where the Court held that when there is a timely objection to concurrent, multiple representation, the failure of the trial judge to at least investigate the need for separate representation violates the Sixth Amendment. Id. at 484, 98 S. Ct. at 1178–79. The allure of the Sullivan test for defendants is that adverse effect is much easier to show than the actual prejudice required when all that is involved is an attorney error.

In the present case the district court rejected Schwab's attempt to fit his situation under Sullivan, concluding that his trial counsel did not "operate[] under an actual conflict," that is, he did not actively represent conflicting interests within the meaning of that decision. The district court reasoned that "[t]he mere fact that defense counsel had personal relationships with the witnesses is insufficient to establish that he labored under a legal duty to inconsistent interests." Schwab disagrees with the proposition that in order for the Sullivan rule to apply counsel must have a legal duty to an actual or potential party in addition to his duty to the defendant. That is not precisely the question we must answer. Given that the issue

comes to us on federal habeas review of a state court judgment, the question is shaped by 28 U.S.C. § 2254(d)(1).

Under that provision of the Antiterroism and Effective Death Penalty Act, a federal court may grant a writ of habeas corpus only if the decision of the state court "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." Id. "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by th[e Supreme] Court on a question of law or if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412–13, 120 S. Ct. 1495, 1523 (2000) (majority opinion of O'Connor, J.); accord Putman, 268 F.3d at 1241. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413, 120 S. Ct. at 1523 (majority opinion of O'Connor, J.); accord Putman, 268 F.3d at 1241. Under either standard the appropriate "measuring stick" is "clearly established federal law," which means "'the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision.'" Putman, 268

33

F.3d at 1241 (quoting Williams, 529 U.S. at 412, 120 S. Ct. at 1523 (majority opinion of O'Connor, J.)) (alteration omitted).

The content of the § 2254(d) unreasonable application test is drawn in large part from the Teague v. Lane, 489 U.S. 288, 109 S. Ct. 1060 (1989), nonretroactivity doctrine and the decisions explicating it. Williams, 529 U.S. at 379–80, 120 S. Ct. at 1506 ("The antiretroactivity rule recognized in Teague, which prohibits reliance on 'new rules,' is the functional equivalent of a statutory provision commanding exclusive reliance on 'clearly established law.' . . . It is perfectly clear that AEDPA codifies Teague to the extent that Teague requires federal habeas courts to deny relief that is contingent upon a rule of law not clearly established at the time the state conviction became final.") (opinion of Stevens, J.). The principal difference is that while federal appellate court decisions are consulted to some extent when applying Teague, the exclusive focus of § 2254(d)(1) is Supreme Court decisions. Id. at 412, 120 S. Ct. at 1523 (majority opinion of O'Connor, J.) ("With one caveat, whatever would qualify as an old rule under our Teague jurisprudence will constitute "clearly established Federal law, as determined by the Supreme Court of the United States" under § 2254(d)(1). The one caveat, as the statutory language makes clear, is that § 2254(d)(1) restricts the source of clearly established law to this Court's jurisprudence.") (internal citation

omitted).

Under Teague a new rule of criminal procedure generally may not be applied in a federal habeas proceeding where the judgment in question became final before the rule was announced. 489 U.S. at 310, 109 S. Ct. at 1075. A judgment becomes final for these purposes when it is past the direct review stage. Caspari v. Bohlen, 510 U.S. 383, 390, 114 S. Ct. 948, 953 (1994); see also O'Dell v. Netherland, 521 U.S. 151, 157, 117 S. Ct. 1969, 1973 (1997); Lambrix v. Singletary, 520 U.S. 518, 527, 117 S. Ct. 1517, 1525 (1997). The judgment Schwab is attacking in this proceeding became final on October 17, 1994 when the Supreme Court denied certiorari, Schwab v. Florida, 513 U.S. 950, 115 S. Ct. 364 (1994). See O'Dell, 521 U.S. at 157, 117 S. Ct. at 1973; Bohlen, 510 U.S. at 390, 114 S. Ct. at 953; Jones v. United States, 304 F.3d 1035, 1038 (11th Cir. 2002); Washington v. United States, 243 F.3d 1299, 1300–01 (11th Cir. 2001).

A rule is considered new for Teague purposes unless it is dictated by precedent—mostly Supreme Court precedent, although federal court of appeals decisions are entitled to some respect in the inquiry, see Bohlen, 510 U.S. at 395, 114 S. Ct. at 956—at the time the judgment became final. Graham v. Collins, 506 U.S. 461, 467, 113 S. Ct. 892, 897 (1993) ("A holding constitutes a 'new rule' within the meaning of Teague if it 'breaks new ground,' 'imposes a new obligation

on the States or the Federal Government,' or was not 'dictated by precedent existing at the time the defendant's conviction became final.'") (quoting Teague, 489 U.S. at 301, 109 S. Ct. at 1070). It is not enough that a rule be within the "logical compass" of decisions existing then, or even that it be controlled by them. Butler v. McKellar, 494 U.S. 407, 415, 110 S. Ct. 1212, 1217 (1990) ("[T]he fact that a court says that its decision is within the 'logical compass' of an earlier decision, or indeed that it is 'controlled' by a prior decision, is not conclusive for purposes of deciding whether the current decision is a 'new rule' under Teague."); see also Graham, 506 U.S. at 467, 113 S. Ct. at 898 ("[U]nless reasonable jurists hearing petitioner's claim at the time his conviction became final 'would have felt compelled by existing precedent' to rule in his favor, we are barred from doing so [on collateral review].") (quoting Saffle v. Parks, 494 U.S. 484, 488, 110 S. Ct. 1257, 1260 (1990)); Glock v. Singletary, 65 F.3d 878, 884 (11th Cir. 1995) ("[T]o 'dictate' a result, prior precedent must be specific; it is not enough that it name the general principle from which the assertedly new rule sprang.").

We take the dictated, truly dictated, requirement about prior precedent from Teague and stiffen it up with the § 2254(d)(1) refinement that only Supreme Court decisions can do the dictating. The result is that a state court decision based on a conclusion of law is to be accepted by a federal habeas court unless a Supreme

36

Court decision in existence at the time the conviction became final truly dictated a different conclusion of law. As framed by the circumstances and arguments in this case, the issue of law is whether the presumed prejudice rule of Sullivan applies to conflicts of interests other than those arising from concurrent multiple representation. The § 2254(d)(1)/Teague issue stemming from that specific issue of law is whether Supreme Court precedent on the books when Schwab's conviction became final dictated a conclusion that Sullivan's presumed prejudice rule did apply in other conflict of interest situations. The only Supreme Court decision Schwab points to is Sullivan itself, which was in existence when his conviction became final in 1994.

The Supreme Court has given us the answer to this question. In 2002, nearly eight years after Schwab's conviction became final, the Supreme Court stated in Mickens v. Taylor, 535 U.S. 162, 122 S. Ct. 1237 (2002), that whether Sullivan applies beyond multiple concurrent representation cases still is "as far as the jurisprudence of this Court is concerned, an open question." Id. at 176, 122 S. Ct. at 1246. After noting many types of personal or financial conflicts to which the courts of appeals have applied the Sullivan exception to Strickland, the Court cautioned:

> It must be said, however, that the language of Sullivan
> itself does not clearly establish, or indeed even support,

37

such expansive application. "[U]ntil," it said, "a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." 446 U.S., at 350, 100 S.Ct. 1708 (emphasis added). Both Sullivan itself, . . ., and Holloway, stressed the high probability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice. . . . Not all attorney conflicts present comparable difficulties.

Id. at 175, 122 S. Ct. at 1245 (some citations omitted). The Court itself emphasized its words "actively represented," making clear that the Sullivan decision itself covers only active legal representation of conflicting interests, "[n]ot all attorney conflicts." See id., 122 S. Ct. at 1245. In case anyone missed the point, the Court spelled it out unequivocally: "Sullivan itself does not clearly establish, or indeed even support such expansive application," and "whether Sullivan should be extended to such cases remains, as far as the jurisprudence of this Court is concerned, an open question." Id. at 175, 176, 122 S. Ct. at 1245, 1246.

If, as the Supreme Court has told us, Sullivan does not hold that a presumed prejudice rule applies outside multiple representation circumstances, so that it is an open question whether the rule of that case should be extended to other types of attorney conflicts, it cannot be that Supreme Court precedent dictates or clearly establishes that the Sullivan rule applies in other conflict situations. Everyone, we

38

think, agrees with that syllogism. The disagreement is over how much attention we should pay to what the Supreme Court told us in Mickens about the scope of the Sullivan holding.

The Second Circuit has said that we need not pay too much attention to the Supreme Court's pointed remarks in Mickens, which that court characterized as nothing more than dicta in a postscript. Tueros v. Greiner, 343 F.3d 587, 593 (2d Cir. 2003) ("[a]s a postscript to its holding"; "the discussion of the scope of Sullivan is dicta"). The Second Circuit insisted in Tueros that "we must look to Sullivan, not to the Mickens postscript." Id. The reason it gave: "If Sullivan by its own terms were to apply to cases other than multiple representation cases, the Supreme Court could not retroactively 'un-establish' this clear law in dicta, because the command of § 2254(d) indicates that we are only able to consider the holdings of Supreme Court cases decided at the time of the state court conviction." Id. at 593–94.

We disagree with the Tueros opinion's dismissal of the Supreme Court's specific pronouncements in Mickens. A lot. We will start with the most fundamental reason. We have always believed that when the Founders penned Article III's reference to the judicial power being vested "in one supreme Court and in such inferior Courts" as Congress may establish, they used "supreme" and

39

"inferior" as contrasting adjectives, with us being on the short end of the contrast. See U.S. Const. Art. III § 1. It would never occur to us to tell the Supreme Court that we would decide our cases based on our analysis of its decisions, not its own analysis of them just because that analysis had been announced in a case where it was not essential to the result.

It is true that the Supreme Court's analysis in Mickens of whether its Sullivan rule applies to conflict of interest situations other than the one involved in the Sullivan case, and its conclusion that the issue remains an open question in Supreme Court jurisprudence, is dicta. However, there is dicta and then there is dicta, and then there is Supreme Court dicta. This is not subordinate clause, negative pregnant, devoid-of-analysis, throw-away kind of dicta. It is well thought out, thoroughly reasoned, and carefully articulated analysis by the Supreme Court describing the scope of one of its own decisions. It constitutes an entire, separately enumerated section of the Supreme Court's Mickens opinion—three long, citation-laden paragraphs, consisting of more than five hundred words. That is some "postscript."

We have previously recognized that "dicta from the Supreme Court is not something to be lightly cast aside." Peterson v. BMI Refractories, 124 F.3d 1386, 1392 n.4 (11th Cir. 1997); United States v. Becton, 632 F.2d 1294, 1296 n.3 (5th

40

Cir. 1980) ("We are not bound by dicta, even of our own court. . . . Dicta of the Supreme Court are, of course, another matter.") (citation omitted); see United States v. City of Hialeah, 140 F.3d 968, 974 (11th Cir. 1998) ("Even though that statement by the Supreme Court . . . was dictum, it is of considerable persuasive value, especially because it interprets the Court's own precedent.").

Other "inferior courts" have expressed similar sentiments. See Wynne v. Town of Great Falls, 376 F.3d 292, 298 n.3 (4th Cir. 2004) ("[W]ith inferior courts, like ourselves, . . . carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative."); Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 561 (3d Cir. 2003) (en banc) ("Although the Committee is doubtless correct that the Supreme Court's dicta are not binding on us, we do not view it lightly."); United States v. Montero-Camargo, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) (en banc) ("We do not treat considered dicta from the Supreme Court lightly. Rather, we accord it appropriate deference. . . . As we have frequently acknowledged, Supreme Court dicta have a weight that is greater than ordinary judicial dicta as prophecy of what that Court might hold; accordingly, we do not blandly shrug them off because they were not a holding.") (quotation marks and citation omitted); Wright v. Morris, 111 F.3d 414, 419 (6th Cir. 1997) ("Where there is no

41

clear precedent to the contrary, we will not simply ignore the [Supreme] Court's dicta."); Bangor Hydro-Elec. Co. v. FERC, 78 F.3d 659, 662 (D.C. Cir. 1996) ("It may be dicta, but Supreme Court dicta tends to have somewhat greater force–particularly when expressed so unequivocally."); Gaylor v. United States, 74 F.3d 214, 217 (10th Cir. 1996); City of Timber Lake v. Cheyenne River Sioux Tribe, 10 F.3d 554, 557 (8th Cir. 1993); McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 19 (1st Cir. 1991) ("We think that federal appellate courts are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings, particularly when . . . a dictum is of recent vintage and not enfeebled by any subsequent statement."); Nichol v. Pullman Standard, Inc., 889 F.2d 115, 120 n.8 (7th Cir. 1989) ("This Court should respect considered Supreme Court dicta.").

It adds little to the discussion to say, as the Tueros opinion does, that "the command of § 2254(d) indicates that we are only able to consider the holdings of Supreme Court cases decided at the time of the state court conviction." Tueros, 343 F.3d at 593–94. The determination of whether a decision in existence at the time a defendant's conviction became final held one thing or another must always be decided after the conviction is final. If the Supreme Court in Mickens had truly held, instead of explained in dicta, that Sullivan did not hold anything applicable beyond the concurrent, multiple representation circumstance, presumably everyone

42

would agree that we inferior courts are bound by that holding about the scope of the prior holding, even though the later holding came after a defendant's conviction became final. What we are considering is how much attention we should pay to what the Supreme Court said in Mickens about what it held in Sullivan.

There is irony in the Tueros opinion's dismissal of the Supreme Court's discussion in Mickens as dicta. The irony is that the statements in Tueros about Mickens are themselves dicta. The Tueros court actually decided the case before it on the ground that, under the facts, the state court's implicit decision that no actual conflict of interest existed within the meaning of Sullivan was not contrary to, or an unreasonable application of, clearly established federal law. Tueros, 343 F.3d at 594–98. The holding of the case is that Sullivan does not apply to any conflicts arising from subjective beliefs that were not grounded in objective duties arising from actual representation. Id. Given that basis of decision, it did not matter in Tueros whether the Sullivan rule applied to cases other than those involving concurrent, multiple representation situations, and that which is not necessary to the decision of a case is dicta, Cotto v. Herbert, 331 F.3d 217, 250 n.20 (2d Cir. 2003) ("We have not hesitated to describe our prior statements as dicta when they were not necessary to the holdings of the decisions in which they were made.");

43

see also Dilg v. George Borgfeldt & Co., 189 F. 588 n.1 (2d Cir. 1911) (stating that because "it is unnecessary to determine the question of estoppel presented, . . . we think that dicta upon the subject would be inexpedient"). Because all that Tueros said about Mickens' dicta is dicta, it is less defiance than gratuitous bravado.

For all of these reasons, we disagree with the Second Circuit's statements in Tueros about the Supreme Court's analysis and statements in Mickens. To the extent, if any, that the Fourth Circuit's decision in United States v. Stitt, 441 F.3d 297, 303–305 (4th Cir. 2006), which involved a § 2255 judgment not subject to § 2254(d)(1), treats the Supreme Court's statements in Mickens in the way the Second Circuit did in Tueros, we disagree with it for the same reasons.

We do agree with the Sixth Circuit's reasoning and decision in Smith v. Hofbauer, 312 F.3d 809, 815–17 (6th Cir. 2002) (quoting extensively from Mickens and concluding that because the question of whether Sullivan's rule applies outside multiple representation circumstances remains an open question in Supreme Court jurisprudence, a claim based on extension of the rule outside those circumstances "is not based upon clearly established Supreme Court precedent as mandated by AEDPA"). We also agree with the Ninth Circuit's similar reasoning and holding in Earp v. Ornoski, 431 F.3d 1158, 1184–85 (9th Cir. 2005), cert. denied, __ U.S. __, __ S. Ct. __, 2006 WL 721847 (May 22, 2006). In that case,

44

the court noted that "[t]he Mickens Court specifically and explicitly concluded that Sullivan was limited to joint representation, and that any extension of Sullivan outside of the joint representation context remained, 'as far as the jurisprudence of [the Supreme Court was] concerned, an open question." Id. at 1184. For that reason, even though Ninth Circuit precedent had extended the Sullivan rule to other contexts, the court concluded that under § 2254(d)(1) the state court judgment embodying a decision not to extend the rule was due to be upheld. Id. at 1185.

We have spent all these words on the import of what the Supreme Court said in Mickens because we do think what the Court said there clearly explains why application of the Sullivan rule outside of concurrent, multiple representation cases is not clearly established under its decisions. But even if the Mickens opinion had never been issued, we would reach the same result. (Call what we have said about Mickens dicta, if you must.) Take away the statements in Mickens and the fact remains that there is no Supreme Court decision holding that any kind of presumed prejudice rule applies outside the multiple representation context. The Sullivan decision itself did not involve any other context. See Smith, 312 F.3d at 818 ("The fact that it was not until Mickens that the Court expressly stated that Sullivan does not support such an expansion, and the fact that the Court said so in dicta, does

45

nothing to change the fact that the rule sought by Petitioner was not clearly established federal law at the time of his conviction nor is at the current time."); Earp, 431 F.3d at 1184–85.

After all, as the Second Circuit reminded us in its Tueros opinion, "the command of § 2254(d) indicates that we are only able to consider the holdings of Supreme Court cases decided at the time of the state court conviction." Tueros, 343 F.3d at 593-94. At the time Schwab's conviction became final there was—and even since then there has been—no Supreme Court decision holding that prejudice should be presumed to any extent where the attorney's asserted conflict of interest does not arise from concurrent multiple legal representation. That's the whole thing under § 2254(d)(1).

For these reasons, a decision that Sullivan's limited presumption of prejudice does not apply in this context is not "contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). Nor is a failure to extend the Sullivan rule to this new context unreasonable either.

## III.

The other issues covered in the certificate of appealability that we granted do not require nearly as much discussion. One of those other issues involves

Schwab's claim that the State did not sufficiently prove the corpus delicti of the crime independent of his inculpatory statements. On direct appeal the Florida Supreme Court rejected this claim on the merits. Schwab, 636 So. 2d at 6. In doing so, it explained that putting Schwab's statements aside, the fact of an abduction, rape and murder were sufficiently shown by the victim's body being found nude in a footlocker at a remote location, his clothes having been cut off, and the medical examiner's opinion that he had died from manual strangulation or smothering. Id. The court could have added that in spite of some decomposition, there was evidence of possible bruising around the anus.

Schwab cites Fallada v. Dugger, 819 F.2d 1564, 1570 (11th Cir. 1987), for the proposition that the corpus delicti corroboration rule, which is part of Florida law, is also required as a matter of federal constitutional law. We need not decide that question. Even assuming that Fallada establishes such a rule, 28 U.S.C. § 2254(d)(1) would be a substantial obstacle to application of that rule in this case. We need not decide the size or effect of that obstacle, however, because even if our review of the merits were wide open, we would agree with the Florida Supreme Court that even without Schwab's statements the evidence is sufficient to establish that a kidnapping, rape, and murder were committed. See Schwab, 636 So. 2d at 6. That is especially true since "the corroborated evidence does not have to prove the

47

offense beyond a reasonable doubt as long as there is substantial independent evidence that the offense has been committed" and "it is sufficient if the corroboration merely fortifies the truth of the confession without independently establishing the crime charged." Fallada, 819 at 1570 (quotation marks and citation omitted).

Another issue covered by the certificate of appealability concerns Schwab's waiver of trial by jury, which he claims was not knowingly and intelligently made. The Florida Supreme Court held that the claim was procedurally barred, Schwab, 814 So.2d at 406 n.3 & n.4. The district court recognized and enforced the procedural bar. The only cause Schwab has asserted for his failure to raise this claim is ineffective assistance of counsel, but as the district court pointed out, he has failed to establish that the assistance his counsel rendered in this respect was ineffective. See also id. at 410–11 (rejecting the claim that counsel were ineffective in connection with waiver of the jury).

The next issue covered by the certificate of appealability is whether counsel rendered ineffective assistance of counsel in connection with the penalty phase of the trial. Schwab contends that counsel was ineffective in regard to the investigation and presentation of mitigating circumstance evidence, and in conduct relating to certain aggravating circumstances. The facts relating to this claim and

48

the Florida Supreme Court's reasons for rejecting it are thoroughly discussed in that court's opinion affirming the denial of Schwab's motion for post-conviction relief. See id. at 412–14. Having studied this matter carefully, it is now obvious to us that the decision is not contrary to, nor does it involve an unreasonable application of, clearly established federal law as determined by the Supreme Court, within the meaning of 28 U.S.C. § 2254(d)(1). The district court correctly denied relief on this claim.

The final issue covered under the certificate of appealability is Schwab's claim that in sentencing him the trial court committed constitutional error in its mitigating circumstance findings. The Florida Supreme Court rejected this claim on direct appeal. See Schwab, 636 So.2d at 7–8. To the extent that Schwab contends that the mitigating circumstance findings are based on incorrect findings of fact, he has not carried his burden under § 2254(d)(2) of establishing that the decision of this claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

This claim also appears to attack the trial court's conclusions that some facts or circumstances were not mitigating. In that respect, it runs counter to a number of decisions recognizing that while sentencing courts may not refuse to consider

49

evidence offered in mitigation, they need not decide that the facts established by that evidence have mitigating force in the context of the case. The Constitution requires that the sentencer be allowed to consider and give effect to evidence offered in mitigation, but it does not dictate the effect that must be given once the evidence is considered; it does not require the sentencer to conclude that a particular fact is mitigating or to give it any particular weight. See Harich v. Wainwright, 813 F.2d 1082, 1101 (11th Cir. 1987) ("Skipper [v. South Carolina, 476 U.S. 1, 106 S. Ct. 1669 (1986)], Eddings [v. Oklahoma, 455 U.S. 104, 102 S. Ct. 869 (1982)], and Lockett[ v. Ohio, 438 U.S. 586, 98 S. Ct. 2954 (1978),] require that the defendant be allowed to present all relevant mitigating evidence to the sentencing jury or court. . . . These cases do not require that the sentencing body accept the conclusion that the evidence constitutes a mitigating circumstance or that the mitigating circumstances outweigh the aggravating circumstances."), adopted in relevant part sub nom. Harich v. Dugger, 844 F.2d 1464, 1468–69 (1988) (en banc), partially abrogated on other grounds by Davis, 119 F.3d at 1481–82; Atkins v. Singletary, 965 F.2d 952, 962 (11th Cir. 1992) ("Although Atkins argues that the trial judge did not consider nonstatutory factors, it is more correct to say that the trial judge did not accept—that is, give much weight to—Atkins' nonstatutory factors. Acceptance of nonstatutory mitigating factors is

50

not constitutionally required; the Constitution only requires that the sentencer consider the factors."); Magwood v. Smith, 791 F.2d 1438, 1449 (11th Cir. 1986) ("[A] federal habeas corpus court will not re-evaluate the weight accorded to particular aggravating and mitigating factors. This determination is left to state courts, provided the death-penalty statute and sentencing hearing meet relevant constitutional requirements.").

Alternatively, if the sentencing court erred in its treatment of the evidence Schwab offered in mitigation or in its treatment of the facts established by that evidence, the error was harmless. The standard for harmlessness in this context is "whether the error had substantial and injurious effect or influence in determining" the sentence. Brecht v. Abrahamson, 507 U.S. 619, 637–38, 113 S. Ct. 1710, 1721–22 (1993); Horsley v. Alabama, 45 F.3d 1486, 1492–93 (11th Cir. 1995). Earlier in this opinion we set out the horrendous facts of this case. The impact of those facts on the sentencing judge's decision, and his opinion about the relative weight of the aggravating and mitigating circumstances, are inescapably conveyed by the order he entered and the findings he made. For example, in explaining why the heinous, atrocious or cruel aggravating circumstance factor applied, he said: "It is impossible for this Court to contemplate another crime that would be more heinous, atrocious and cruel than the death of Junny Rios Martinez. The terror of

51

the abduction and rape followed by the slow death of strangulation or suffocation was extreme." Schwab, 636 So.2d at 7 n.6.

In addition to finding that the especially heinous, atrocious, or cruel aggravating circumstance applied, the court also found as aggravating circumstances that Schwab previously had been convicted of another capital felony or one involving the use or threat of violence, and that the murder was committed during the course of kidnapping and sexual battery. See Fla. Stat. § 921.141(5)(b), (d), (h). The court not only concluded that the aggravating circumstances outweighed the mitigating ones, but also found "that any one of the three aggravating circumstances outweighs all mitigating circumstances." There is no possibility that any error the judge may have made in describing the evidence offered in mitigation or in discussing the circumstances proven by that evidence had any effect or influence on his sentencing decision, much less a substantial and injurious one.

## IV.

The district court's denial of Schwab's petition for federal habeas relief is AFFIRMED.